H. B. SANBORN AND J. F. GLIDDEN AND HOUSTON & TEXAS
CENTRAL RAILWAY COMPANY V. GUNTER & MUNSON.

No. 6429.

1.  **Constitution—Sale of Public Land.**—Section 4 of article 14 of the Constitution, "No certificate for land shall be sold at the Land Office except to actual settlers upon the same, and in lots not to exceed 160 acres," relates exclusively to the sale of land certificates at the Land Office, and does not affect the validity of the act approved July 14, 1879, and amendment March 11, 1881, providing "for the sale of a portion of the unappropriated public lands of the State of Texas," etc.  Sales under this law are valid.

2.  **Findings of Fact—Practice in Supreme Court.**—The rule is to sustain the findings of the court when there is in the record evidence tending to support them. See facts sustaining the finding of the trial court, that the surveys under which appellants claim were not made upon the ground, but the field notes were attempted to be made by the surveyor outside of the land district "from a very imperfect and incorrect meander of the river (called for) made by said deputy while doing some other work." *  *  *

3.  **Surveys of Public Land.** — Actual surveys by which lands granted by the State shall be specifically described and distinguished have always been contemplated

and prescribed by our statutes. Such surveys, however, have not always been regarded as indispensable.

4. **Excuse for Imperfect Survey.** — That danger of hostile Indians prevented the surveyor from making surveys upon the ground will not be a reason for holding that a survey which is not one.

5. **Conflicting Calls — Case in Judgment.** — A surveyor having an imperfect knowledge of the course and meanders of a navigable river attempted to construct surveys without going upon the land, appropriating the land upon its south bank. The block of surveys began at a known point. The surveys were numbered 1 to *158.* Survey No. 1 began at the known corner and called for the river for north boundary. The east and west lines called to run north and south; the south lines east and west. Each succeeding survey called to begin at the northwest corner of the one below it, with like calls for sides and ends. From a bend in the river not known to the surveyor it was impossible to construct survey No. 109 of the series as called. Either the call for the river or for the connection of the surveys on each other had to be abandoned. The conclusion of the trial court is affirmed, that the block of surveys "must be located by running west from the northeast corner of No. 1, and tying each succeeding survey to the one preceding it; and that the only way to do this is to cross the river at No. 109 and locate the succeeding sections" as called for. This mode of survey left unlocated the territory upon the south side of the river west of survey 109.

6. **Corrected Field Notes—Resurveys.**—Subsequent to the withdrawal of the land from location the owner of the block of surveys sought to correct the field notes of the surveys No. 109 to 158 by making other connections upon the south side of the river. *Held,* that as the attempted corrections included lands entirely different from that covered by the original surveys, and as the land had been withdrawn from location, said corrections had no effect whatever.

7. **Trust — Facts Not Creating a Trust.**—Parties locating land certificates for the owner on a fixed price having been paid for their locations on a contract made with a partner, do not sustain a fiduciary relation to the owners of the certificates so located as to estop them from making locations upon or buying from the State land which by their own mistake was not included and covered by the certificates so located.

8. **Warranty.**—Suit for land against vendees of a railway company holding under its warranty. The land had been included in a deed of trust before sold. The railway was in the hands of receivers under proceedings in the United States Circuit Court, where foreclosure proceedings also were pending in behalf of the trustees in the deed of trust. The defendants vouched the railway company in warranty and made the receiver and the trustees parties. *Held,* that judgment against the railway company on its warranty was valid, the land being recovered by plaintiffs. Decree against the receiver and the trustees, and in attempting to determine the order of payment in the matters pending in the United States Court, was unauthorized; as to the receiver and trustees the judgment below is reversed and dismissed.

APPEAL from Grayson. Tried below before Hon. H. O. HEAD.

No statement is necessary.

*T. D. Cobbs,* for the Houston & Texas Central Railway Company; *Bryant & Dillard,* for Glidden & Sanborn, appellants.—1. The court erred in not sustaining the general demurrer and special exception, because the law under which plaintiffs claim is in contravention of section 4, article 14, of the Constitution of the State of Texas. Const., art. 14, sec. 4.

2.    The evidence shows that the surveys were made under a contract between J. W. Maddox and the railway company, and the work shows that the data for the surveys was obtained by work actually done upon the ground.

3.    It was the duty of the court in determining the location of the surveys to discern what was the intention of the surveyor, and to give full effect to this intention just as far as the evidence of title permitted. The intention of the surveyor in this case, as is shown by his own testimony and his work as well, was to place the surveys south of the Canadian River and adjoining it as a navigable stream; and here the maps place them; and here a proper interpretation of the field notes place them.    Woods v. Robinson, 58 Texas, 660; McAninch v. Freeman, 69 Texas, 446; Galveston County v. Tankersley, 39 Texas, 651; Phillips v. Ayres, 45 Texas, 602; Boon v. Hunter, 62 Texas, 583; Jones v. Andrews, 62 Texas, 653; Tucker v. Smith, 68 Texas, 474; Massie v. Watts, 6 Cranch, 153; Newsom v. Pryor's Lessees, 7 Wheat., 7; McIver v. Walker, 4 Wheat., 444.

4.    The court erred in holding that survey 109 could not be located on the ground so as to connect with survey 108 without crossing the river; as said survey 109, by changing its conformation but still following out the intention of the surveyor, and having the proper river frontage and regarding it as a navigable river, could be so located.

5.    The court erred in finding that survey 109 could only be placed on the ground by crossing the river, and that this would force the balance of the surveys to lie across the river; for if said survey did cross the river it would be only by cutting through it; its south line would lie south of the river, likewise a good portion of the east line and its west line; and if any survey would be invalidated it would only be survey 109; and it would furnish a good beginning corner for survey 110, and the balance of the surveys, and the field notes and maps as well, would show how these surveys should be located as they would place them as claimed by defendants.

6.    The locations and surveys made by Maddox embraced the land in controversy, and segregated it from the public domain and appropriated it to the Houston & Texas Central Railway Company.    Thompson v. Railway, 68 Texas, 392; McKinney v. Grassmeyer, 51 Texas, 381; Gibson on Surveying, 233.

7.    If the Maddox survey and field notes do not appropriate for the State and the company all the land in controversy, they yet appropriated so much of it as would be embraced in the Maddox field notes following the true meanders of the river, and having the east and west lines of each survey as made by Maddox, the distance given by him, and the south line of each survey 950 varas in length.

8.    At the time Gunter & Munson made their surveys and locations, under whom the plaintiffs claim, the land in controversy was

equitably owned by the Houston & Texas Central Railway Company under color of title from the State, and was not unappropriated public domain. Const., art. 14, sec. 2; Rev. Stats., art. 3921; Winsor v. O'Connor, 69 Texas, 571; Land and Cattle Co. v. State, 68 Texas, 526; Adams v. Railway, 70 Texas, 252; Truehart v. Babcock, 51 Texas, 169; Summers v. Davis, 49 Texas, 541; Gullett v. O'Connor, 54 Texas, 408; Gilbeau v. Mays, 15 Texas, 417; Cook v. Burnsley, 11 Wall., 659.

9. The survey made by Tutt (correcting) was not a location of new land, but was a correction of the survey made by Maddox, and the land covered by the Tutt field notes is the same land appropriated to the railway company by the Maddox survey. Rev. Stats., arts. 3918, 3919; Railway v. Thompson, 65 Texas, 187; Loving v. Corcoran, 26 Texas, 92.

10. The work done by Maddox and the steps taken subsequent thereto constituted such an equitable appropriation of land to the State and the railway company that any error in the surveys could be corrected by them at any time prior to the issuing of patents.

11. The court erred in not considering defendant's block of surveys to be a unit, and to be considered together equivalent to a file, and as one survey and appropriation of the whole body of land within the boundary of said block 46, without regard to any particular description of any particular survey. Railway v. Thompson, 65 Texas, 187; Jones v. Burgett, 46 Texas, 285.

12. Gunter & Munson, by reason of their agency for the railway company in locating and surveying said lands, were estopped from asserting its vacancy as against said company, and from acquiring title from the State which they could enforce against said company. Hamilton v. Rice, 15 Texas, 382; Hollingsworth v. Holshousen, 17 Texas, 41; Patton v. Skidmore, 19 Texas, 533; Ringo v. Bins, 10 Peters, 269; Massey v. Watts, 6 Cranch, 148; Gower v. Andrew, 59 Cal., 119.

13. If Gunter & Munson by their locations and surveys acquired from the State any title to the sections claimed by the defendants, they should hold such sections in trust for the defendants, and defendants would not have to refund to said Gunter & Munson any sum paid by them in acquiring title to said land in wrong of defendants' rights.

*T. D. Cobbs*, for Easton, Rintoul, and Dillingham, receivers Houston & Texas Central Railway; *Willie, Mott & Ballinger*, for Easton and Rintoul, trustees, etc.— 1. A nonresident can not be brought within the jurisdiction of the courts of this State in a personal action by service of process made upon him without the limits of the State. 2 Ct. App. C. C., sec. 92; Pennoyer v. Neff, 95 U. S., 714; St. Clair v. Cox, 106 U. S., 353; Pana v. Bowler, 107 U. S., 545; Freem. on Judg., sec. 564; Ct. App. C. C., sec. 129.

2.   The court erred in its conclusions of law in holding that the equities of the defendants Glidden & Sanborn are superior to those of the mortgagees in the mortgage given by the Houston & Texas Central Railway, in which the defendants James Rintoul and N. S. Easton are trustees, and holding that such trustees and James Rintoul, N. S. Easton, and Charles Dillingham, receivers of the said railway company, be decreed to repay to said Glidden & Sanborn the sum of $14,-628.96, with interest thereon from the date of said conclusions at the rate of 8 per cent per annum, being the amount of purchase money received for the land in controversy, before any portion of the proceeds of the undisposed of property mortgaged in the same instrument as the land in controversy is paid to the mortgagees therein, because there was no equity in favor of Glidden & Sanborn against said trustees, bondholders, or receivers, or the Houston & Texas Central Railway, or either of them, upon the breach of the covenant of the sale of land.   Nor did the court have the right, power, or jurisdiction to adjudicate the questions of equities of this proceeding, if any such there were.   Railway v. Cowdrey, 11 Wall., 459; Ellis v. Railway, 107 Mass., 1; Haven v. Adams, 4 Allen (Mass.), 80; Crosby v. Harlowe, 21 Me., 499; Burnham v. Bowen, 111 U. S., 776; Fosdick v. Schall, 99 U. S., 235; Heidekoper v. Locomotive Works, 99 U. S., 258; Hale v. Frost, 99 U. S., 389; Bridge Co. v. Douglas, 12 Bush., 673; Blair v. Railway, 5 Fed. Rep., 846; Turner v. Railway, 8 Biss., 315; Duncan & Elliott v. Railway, 2 Woods, 542; Denison v. Railway, 4 Biss., 416.

*Brown & Gunter* and *Davis & Garnett*, for appellees.— 1. The Act of July 14, 1879, and the amendment thereto of March 11, 1881, under which the appellees bought the land from the State of Texas, were constitutional and valid, and the acts alleged in plaintiffs' petition gave to plaintiffs a vested right to the land if it was vacant at the time that they purchased it.   White v. Martin, 66 Texas, 340; Land and Cattle Co. v. The State, 68 Texas, 526.

2.   The evidence shows that the field notes under which appellees claim the land were made by calculation, and not by a survey in whole or in part upon the ground, and that the surveyor neither resided in the district nor was in it when they were made, hence the surveys were void and conferred no rights upon the appellees.   Linn v. Scott, 3 Texas, 67.

3.   Course and distance will control a call for a natural object which is called for by conjecture, and this is surely true when the survey is a paper survey made at a great distance from the location of the land. Chinoweth v. Haskell, 3 Pet., 303; Robinson v. Doss, 53 Texas, 496; Booth v. Strippleman, 26 Texas, 436.

4.   From the description contained in the field notes of the surveys the land must be identified, and these calls can not be contradicted,

changed, or destroyed by an intention not expressed in the field notes themselves. In these field notes there is no ambiguity to be explained. Chinoweth v. Haskell, 3 Pet., 96; McAfferty v. Conover, 70 Am. Dec., 57; Blassingame v. Davis, 68 Texas, 595; Booth v. Upshur, 26 Texas, 67; Booth v. Strippleman, 26 Texas, 441.

5. The field notes under which the appellants claim did not embrace the land in dispute. The evidence shows that the calls of the surveys from 108 west would necessarily force the location of all the subsequent surveys on the north side of the Canadian River, which would not embrace any of the lands in controversy.

6. The field notes of Maddox did not appropriate any of the land in controversy, and the land was reserved from location and survey by the Act of 14th July, 1879, and had been purchased by plaintiffs long before the survey by Tutt. A survey can not be corrected so as to embrace lands not embraced in the original survey. Hughes v. Perry, 21 Texas, 778; Kimmell v. Wheeler, 22 Texas, 86; Wood v. Darrett, 28 Texas, 429; Bartlett v. Hubert, 21 Texas, 8; Railway v. Thompson, 65 Texas, 187.

7. If Gunter & Munson ever bore any fiduciary relation to the Houston & Texas Central Railway Company, it expired with the accomplishment of the work in 1874, and the land was not acquired until 1882, after all such relations of contract or agency, if any, had ceased to exist.

8. The land in controversy was not appropriated by the appellees' field notes, but remained the property of the State; and the State offering it for sale to any purchaser, the appellees could not be estopped from purchasing it the same as any other citizen. Spier v. Laman, 27 Texas, 205; Wheeler v. Styles, 28 Texas, 240.

HENRY, ASSOCIATE JUSTICE.—This suit was brought by the appellees against the appellants Sanborn & Glidden and the Houston & Texas Central Railway Company, to try title to thirty-nine surveys of land situated in Potter County and ten surveys situated in Oldham County, each survey containing 640 acres.

The defendants pleaded not guilty, and the defendants Glidden & Sanborn pleaded against the plaintiffs a claim for permanent and valuable improvements, and also prayed judgment against the railway company, which was their vendor, upon its covenant of warranty of title, if plaintiffs should recover. They also caused the receivers of the railway company and the trustees in certain mortgages executed by it upon the lands in controversy to be made parties defendant, and sought to establish against them a prior lien for the purchase money paid by them for the land. The cause was tried without a jury, and the following conclusions of fact were filed by the judge:

"I find that on the 26th day of June, 1874, one John W. Maddox made a written contract with the Houston & Texas Central Railway Company to locate for it a large number of land certificates in 640-acre surveys, said surveys to be in a block on the Canadian River, in the Panhandle of Texas; that under said contract Maddox had a deputy surveyor of that land district to make out in his (Maddox's) office at Sherman the field notes of such surveys in squares, two deep, showing the Canadian River to run through this block. None of these surveys were made on the ground as required by law, but the field notes were attempted to be made by said Maddox and said deputy surveyor outside of the land district, from a very imperfect and incorrect meandering of the river made by said deputy while doing some other work for said Maddox a short time before. The railway company refused to receive this work, on the ground that the Canadian was a navigable stream, and required Maddox to make out field notes recognizing it as such by fronting only one-half of the square thereon. This new work was also done by said Maddox and the deputy surveyor in their office outside of the land district. These new field notes were made by having section No. 1 to commence its northeast corner at a known object planted as a corner of a previous location, and each subsequent section called to commence at the northwest corner of the preceding number until 109 was reached, which calls to commence at 800 varas north of the southwest corner of 108, and each section subsequent to 109 calls to commence at the northwest corner of the preceding number. All of the surveys call for the Canadian River as their north boundary line, and purport to give the meanderings thereof, and give the south line of each to be 950 varas, and the length of the east and west lines to correspond with this and the meanderings given of the north line on the river, so as to contain 640 acres.

"The course of the east, south, and west lines of all the surveys is the same, viz., east and west and north and south. Taking these field notes to be correct, they would represent a block of surveys of 640 acres each, fronting one-half of the square (950 varas) on the south side of the Canadian River, commencing at No. 1 and running west to No. 158, and each survey fastened to the west line of the preceding one.

"The field notes of the surveys thus made out were certified by the deputy surveyor in compliance with the law, recorded in the survey-or's office, and filed in the General Land Office; and the railway company then paid said Maddox for said work $24 per section, that being the contract price.

"At the time said work was received and paid for by it, the railway company had notice that it was office work, and had not been done on the ground in compliance with the law.

"At the time when said Maddox made said contract with the rail-way company the plaintiffs were dormant partners therein, and aided

him in making out the field notes as above set forth, and afterward by suit in the District Court they recovered of Maddox their part of the money paid him by the railway company; and they had full notice of how the field notes had been made and of the imperfect meanderings of the river upon which the same were based.

"The surveys from 1 to 108 inclusive can be located without any great variation from the field notes returned by Maddox as above, although in no case except section No. 1 would such field notes be strictly correct, and in a great number of surveys the meanderings of the river and length of the east and west lines would have to be radically changed; but when 109 is reached, then owing to a sudden bend in the river to the south, and in some cases a little southeast of south, it is impossible to connect this section with section No. 108 without placing it in and on the opposite side of the river, and it is impossible to locate 109 so as to make the river its north line, without dropping from two and one-half to three miles south of the south line of 108, where the river again turns to the west, and there make a new beginning with nothing to locate it by, and all surveys west of this would be dependent upon this new beginning point. The land in controversy in this suit commences at 120 as it would be thus located, and runs west with the surveys as they would be located by the Maddox field notes calling for 109 as above set forth.

"No steps were taken by the railway company to in any way correct the Maddox field notes until the year 1884, and after the filing of this suit, when it had an accurate survey made on the ground of all the sections, and located 109 at the bend of the river two and one-half to three miles south of 108, as above set forth, and each of the succeeding sections were commenced at the northwest corner of the preceding one, as called for in the original field notes; and these corrected field notes were certified by the proper surveyor and returned to the General Land Office, where they are now filed. This was, however, only a short time and as soon as it could be done after said company learned of the defect in the original field notes.

"Prior, however, to this attempt at correction by the railway company, to-wit, in ——, 1882, Gunter & Munson made application and had surveyed on the ground the land described in the petition, and within the time required by law returned the field notes to the General Land Office, paid the purchase price, and did everything to entitle them to said land under an act of the Legislature, entitled 'An Act to provide for the sale of a portion of the unappropriated public lands of the State of Texas, and the investment of the proceeds of such sale,' approved July 14, 1879, and the amendment thereto, approved the 11th day of March, 1881, unless the defendants who own the interest of the Houston & Texas Central Railway have a superior right thereto by reason of the several surveys above set forth."

The judge filed the following conclusions of law:

"I conclude, that the northeast corner of section No. 1 being the only point called for in the railway company's original location that can be identified on the ground, this block of surveys must be located by running west from this point and tying each succeeding survey to the one preceding it, and that the only way to do this is to cross the river at 109 and locate the succeeding sections from three to five miles north of the river, and as thus located no part of the land in controversy will be included.

"I conclude, that if it were possible to locate on the ground any point called for in the field notes of 109, so as to give it the river for its north line, it would be necessary to locate it from such point; but it being impossible to do this, as shown by the findings of fact, the remainder of this block must be located as above set forth.

"I conclude, that if the corrected field notes and surveys made by the railway are corrections, and not relocations and appropriations of new lands, that such corrections would have priority over the locations made by the plaintiff, and would entitle the defendants to a judgment.

"But I conclude, that such surveys were such relocations and appropriations of new lands as could not be made after the acts of the Legislature withdrawing the same from location, and such as could not have been made without withdrawing the certificates and proceeding as in the first instance, and that therefore the land in controversy depends upon the rights of the parties under the Gunter & Munson locations."

Appellants assign errors as follows:

1. "The court erred in not sustaining the general demurrer and special exception contained in said company's first amended original answer, and adopted by Glidden & Sanborn, because the law under which plaintiffs claim is in contravention of section 4, article 14, of the Constitution of the State of Texas."

The section here referred to relates exclusively to the sale of land certificates at the Land Office, and does not, we think, affect the validity of the law through which plaintiffs derive their title. The argument of appellants refers to and quotes section 2 of the same article. That section relates alone to the location of land certificates, and contains no reference with regard to such sales as were made to Gunter & Munson. Unless the lands in controversy had been previously lawfully appropriated by the surveys made for the railway company, we see no reason for questioning the correctness of the conclusion that Gunter & Munson acquired them by their purchase.

2. "The court erred in his first special finding in the several matters pointed out in defendants' first joint bill of exceptions, said finding not being supported by the evidence, but variant from it, as fully appears in the statement of facts."

The bill of exceptions here referred to calls in question the correctness of the findings of fact, to the effect that the surveys for the railway were not made upon the ground, but that the field notes were attempted to be made by the surveyor outside of the land district, "from a very imperfect and incorrect meandering of the river, made by said deputy while doing some other work for said Maddox a short time before."

Upon this subject F. M. Maddox, the deputy who made and certified the railway company's surveys, testified as follows: "In 1873 and 1874 I was a deputy surveyor of Jack Land District. During that time I was doing some work for J. W. Maddox in locating certificates for the Houston & Texas Central Railway Company, under a contract that he had with it. These locations were made on the Canadian River, and are what is known as the Houston & Texas Central Railway block No. 42. After this work was completed Maddox had me to do some work west of this, so that if he should be able to get other certificates to locate for said company he would be able to make out the field notes without coming again upon the ground. This work consisted in running a line along the high land along the north side of the river west of block 42, and at what we considered proper intervals, making projections from this line into the river and measuring the distance. We also marked some trees along this work, and made bearings therefrom.

"We did not do any work on the south side of the river (where the land in controversy lies), nor did we attempt to make an accurate meandering of the river on the north side, our object being to make such a general survey of the river as would enable us from this work to make out field notes that would appropriate the land on both sides without coming again upon the ground. At the time this work was done the hostile Indians were very bad, especially on the south side of the river, and it would have been impossible to have done any work on that side with anything short of several hundred men, and we had to do the work on the north side in such haste that it was not practicable to be more accurate than we were. In making this work I was assisted by J. W. Maddox, and W. B. Munson, one of the plaintiffs. Said Munson did a considerable part of the work in making the projections to the river as above set forth.

"After we returned to Sherman from doing this work, J. W. Maddox made arrangements to locate a large number of certificates for the Houston & Texas Central Railway Company on this land, and in our office at Sherman we made out the field notes for two blocks of surveys in 640-acre tracts of square form, and covering the land two miles on each side of the river, as it would be according to our work as above made. Some of these surveys would have the river running through them, and some of them would corner in the river. In other words,

these field notes did not treat the river as a navigable stream.    These field notes were regularly certified by me as deputy surveyor, but were not acceptable to the Houston & Texas Central Railway Company; and not long after this I was furnished with some calculations which I understood were made by —— Hutchins, a clerk in the Land Office, from the work that I had done on the ground as aforesaid, and was instructed by J. W. Maddox and plaintiffs from these calculations to make out new field notes recognizing the river as a navigable stream by fronting only one-half of the square thereon.    This I did in my office at Sherman without going on the ground, and certified the field notes thus made, and returned them to the General Land Office; and this work represents what is known on the map as the Houston & Texas Central Railway Company's blocks 46 and 47 — 46 lying on the south side and 47 on the north side of the river.    It is not necessary to meander both sides of a river to construct blocks of surveys on both sides.    If one side is correctly meandered, this will sufficiently give the meanderings of the other side.    In the second set of field notes made out as aforesaid and returned to the Land Office, it was the aim and intention to have block 47 cover and appropriate the land on the north side of the river, and block 46 to cover and appropriate that on the south side."

There was other evidence to the same effect.    The rule is to sustain the findings of the court when there is in the record evidence tending to support them.    We think the evidence amply sustains the one now in question.

Other assignments of error object to the court's conclusions of law and the judgment rendered in pursuance thereof, to the effect, that the railway's block of surveys "must be located by running west from the northeast corner of section No. 1 and tying each succeeding survey to the one preceding it, and that the only way to do this is to cross the river at 109 and locate the succeeding sections from three to five miles north of the river;" and that "the corrected field notes and surveys made by the railway is such a relocation and appropriation of new land as could not be made after the acts of the Legislature withdrawing the same from location, and such as could not have been made without withdrawing the certificates and proceeding as in the first instance."

Upon the contrary, it is contended that "the true way of locating said surveys is to place them as they were intended by the surveyor to be placed, to-wit, on the south side of the Canadian River, and fronting it as a navigable stream, each survey in succession taking consecutive half-mile frontage; and that sufficient evidence was offered in the field notes, and in the maps as well, to thus locate them, and they could and should have been thus located, though in so doing it be necessary to place survey 109 so that it would not again adjoin survey 108;" and also, that "said survey 109, by changing its conformation

but still following out the intention of the surveyor, and having the proper river frontage and regarding it as a navigable stream, could be so located, for if said survey did cross the river it would be only by cutting through it.   Its south line would lie south of the river, likewise a good portion of the east line and its west line, and if any survey would be invalidated it would only be survey 109, and it would furnish and indicate a good and sufficient beginning corner for survey 110 and the balance of said surveys, and the field notes and maps as well would show how these surveys should be located, and they would place them as claimed by defendants; and that the evidence shows and the law holds that the first survey of the land placed the land south of the Canadian River and adjoining it.   And the field notes as returned by Maddox were sufficient to identify the land on the ground and placed it there.   And if in any particular said field notes failed to fully describe and mark out the specific land claimed by defendants, yet they were an equitable appropriation of the same as to all persons taking with notice of defendants' claim and rights; and defendants prior to the issue of patents would have a right to correct any mistake in the field notes, so as to definitely describe the lands intended to be appropriated, and the second survey by the Houston & Texas Central Railway Company was such correction."

Actual surveys by which lands granted by the State shall be specifically described and distinguished have always been contemplated and prescribed by our laws.   It is true, that under the laws in force when the surveys now in controversy were made for the railway company it was not always regarded as indispensable, however desirable, that the lines of the survey should be actually run and measured on the ground. As was said by this court in the case of Thomson v. Railway, 68 Texas, 397, "the appropriation of the copies of the certificates to the lands described in the field notes certified by the county surveyor legally appropriated the land, even though the correctness of the field notes may have been ascertained by the work formerly done by the deputy or in some other manner than by an actual survey made before or after the copies of certificates issued."

In this case, not only was no actual survey of the land pretended to be made, but no description of it, accurate or otherwise, was ever acquired in any way.   Instead of a survey, an excuse why none was ever made is offered.   Danger from hostile Indians, so imminent as to prevent a survey, furnishes a better excuse for the failure of the agent to serve his principal than it does for giving away the public domain without a compliance with the laws of the State.   The fact that the danger was so formidable as to prevent the mass of scripholders from making the necessary surveys furnishes no good reason why the particular scripholder should acquire the land without a survey.

It was undoubtedly the intention of the surveyor to make the surveys join by locating each succeeding survey upon the preceding one. The river was called for, because it was believed that the surveys when so located upon each other would be also situated upon it. If the river had not existed or been mentioned, the other calls would have sufficiently identified the land. The river was called for in connection with the other calls only because its true position was unknown. It was called for because it was erroneously believed that it would form the northern margin of the surveys when they were located one upon the other according to course and distance. Either the calls for the river or the calls for the connection of the surveys on each other must give way.

Without a complete survey, the surveyor had acquired sufficient information to correctly locate the surveys upon each other by course and distance; but he had not acquired knowledge of the true position of the river, nor did he have information in any way by which he could correctly locate them upon the river. To make the calls for the river control, under such circumstances, would demand not only the disregard of statutes requiring surveys, but also that the known shall yield to the unknown. It would be as easy to say that all the land lying on the principal rivers in the State, if not the whole public domain, could have been as well taken up by going to their sources and establishing monuments there and then simply calling for surveys projecting from them.

While it must be admitted that when surveys are actually made or ascertained, calls for a river will usually prevail over calls for another survey, or for course and distance, the rule is not inflexible. As said by this court in the case of Robinson v. Doss, 53 Texas, 506: "There are many cases where the course and distance will control natural marks or boundaries, as where it is apparent on the face of the grant that these were inserted by mistake, or were laid down by conjecture, and without regard to rule; and so of a variety of cases which may be supposed to exist. In the abstract, all other things being equal, a river prevails over a marked line, and a marked line over course and distance. Still, the lowest grade, to-wit, course and distance, is made to prevail over the highest grade, to-wit, rivers, creeks, etc., when, upon applying the calls of the grant to the land, the surrounding and connected circumstances adduced in proof to explain the discrepancy show that course and distance is the most certain and reliable evidence of the true locality of the grant."

We think the court correctly concluded, that the second surveys made for the railway, being of entirely different land, could not be treated as mere corrections of the original surveys. Railway v. Thompson, 65 Texas, 186.

It is contended, that "the court erred in his fifth special finding, in holding that Gunter & Munson could in any event recover against the

Houston & Texas Central Railway Company and Glidden & Sanborn, for Gunter & Munson had occupied such a fiduciary relation to such company in procuring the surveys, and been so paid by the company in procuring them, that they were precluded from asserting against said company the vacancy of the land, and were precluded from acquiring from the State title in hostility to the title of said company and its vendees. If they acquired any right, such right would be in trust for the company; and said company having done what was required of it by law, or if in any particular having left it undone, having done this through the agency of Gunter & Munson, and having paid Gunter & Munson, said company would not be compelled in equity to refund Gunter & Munson any sums by the latter expended with full knowledge of the company's rights and in direct contravention of the company's interest."

The contract between Maddox and the railway company under which the surveys were made reads as follows:

"*State of Texas, County of Harris.*—Memorandum of an agreement entered into by John W. Maddox, party of the first part, and Robert M. Elgin, land agent of the Houston & Texas Central Railway Company, for said company, party of the second part, witnesseth: That the party of the first part is to locate, survey, and return to the General Land Office the remaining 250 land certificates named in a contract heretofore entered into by the same parties, and fifty additional certificates, making 300 certificates, at the rate of $24 silver coin per certificate; the payments for which are to be made as follows: $1200 on the 1st of November next, in case the field notes are returned by that time, and the remainder in two equal installments of $3000, payable on the 1st of March and October, 1874. .

"This 26th June, 1874.     [Signed] "JNO. W. MADDOX.

"ROBT. M. ELGIN,
"Land Agent H. & T. C. Ry. Co."

Robert M. Elgin testified, among other things, that he objected to the field notes first returned by Maddox, because the surveys crossed the river instead of fronting one-half the square thereon as the law required surveys on navigable streams to be made; and that he afterward returned field notes to the General Land Office representing blocks 46 and 47, the surveys fronting one-half of the square on the Canadian River.

He further testified: "I gave no instructions as to how the change was to be made. I did not know that he was not going on the ground again to meander the river, but did not expect him to do so, as I supposed he had sufficient data to do the work, obtained from making the surveys on the ground and having meandered the river, which was

shown me on his plat. I paid him $25 per section for the first 500 sections, and $24 per section for the balance. I would not have paid him that for an office survey. I could have made that myself. I only knew John W. Maddox in the transaction. I did not know that Mr. Munson was interested in the contract; from circumstances, I suspected that he was. I knew nothing of the error in the surveys until after Gunter & Munson had filed on the land. The first I knew about it Mr. Munson had been to Austin to see the Commissioner of the General Land Office about his surveys, and he came on to see me in Houston and proposed a compromise. The exact terms I do not remember, but it involved the abandonment of our surveys, and we were to get as much land out of his location, which covered the company and State school sections."

Munson, one of the plaintiffs, testified as follows: "I went to Houston to see Major Elgin, and informed him of the error in block 46, and told him that I did not believe that his field notes would hold the land, and that the State had put the land on the market for sale at 50 cents per acre, and some one would take it up and buy it. I proposed for the road to give up its claim and I would buy it under this law, and if he would pay half the money to buy the land and half the expense I would secure the land for the railway. I desired to do this, as I had been connected with the matter. Elgin declined this, and I then offered if he would lend me half the money to pay for the land, at 50 cents per acre, I would save the land for him; but he refused, and I then, for Gunter & Munson, had it filed upon, surveyed, and returned, under the 50-cent act."

We are unable to concur with appellants in their claim that Gunter & Munson were estopped from purchasing the lands for themselves, or that in equity they should be treated as holding them for the benefit of the railway company. When they purchased them they did not hold any agency for the railway company or have any confidential relation toward it. While they were the partners of Maddox when the surveys were made, it was Maddox and not them who was trusted by the railway company. Being pecuniarily interested in the enterprise, they were no doubt jointly liable with Maddox for such damages, if any, as were caused by the negligent discharge of their duties.

The finding of the court, that the railway company had notice that the surveys were "office work and had not been done on the ground," has, to say the least, some evidence to support it without anything to contradict it. The cause of the trouble was, that the field notes returned were the result of "office work" instead of an accurate survey of the river. The result of the mistake was to keep the title to the lands in the State, with the right to sell them to any purchaser it could find, not excluding Gunter & Munson. It does not become necessary for

us to hold that the railway company had no recourse upon Gunter & Munson if it had been pursued in a proper time and manner. But from all the facts of the case we do not think that they can be held to hold the title purchased by them from the State in trust for the railway company or its vendees, or to be estopped from asserting it against them.

In the year 1882 the Houston & Texas Central Railway Company sold to appellants Glidden & Sanborn eighteen sections of the land in controversy, and conveyed the same to them by its deed containing a covenant of general warranty of the title thereto. Previous to said conveyance the railway company had conveyed all of its lands, including the above, to trustees to secure its bonded indebtedness.

Glidden & Sanborn paid part of the purchase money in cash and executed their notes for the balance, part of which had been paid when the final judgment in this cause was rendered, and the remainder of them was still outstanding. They pleaded the warranty against their codefendant the railway company, and against Gunter & Munson a claim for improvements made in good faith.

The deeds of trust executed by the railway company were still outstanding when this suit was commenced, and suits were then pending in the United States Circuit Court for the Eastern District of Texas for their foreclosure, in which suits receivers had been appointed, who, under the orders of said court, had taken possession of the lands in controversy and were holding them subject to the orders and disposition of that court.

The defendants Glidden & Sanborn procured from the judge of the United States Circuit Court the following order, upon their petition to make the receivers parties to this suit, to-wit:

"Order.—The prayer of the above petition is granted, with the understanding and proviso that in no event shall possession or control of the receivers of the Houston & Texas Central Railway property be affected or disturbed by any judgment rendered in the above mentioned case.       [Signed]    "DON PARDEE, Circuit Judge.

"January 14, 1887."

Subsequently said defendants filed an amended answer in this cause, in which they made the receivers and the aforesaid trustees defendants; and upon a statement of the transactions of all parties with regard to the properties of the railway company, charged that they had equitable claims upon the properties in the hands of the receivers superior to the claims secured by the deeds of trust. They prayed for a judgment against the railway company, the trustees, and the receivers, for the recovery, with interest, of the purchase money paid, and for the surrender and cancellation of their unpaid notes, and against the plaintiffs for the value of their improvements made upon the land.

The judgment of the court was in favor of Gunter & Munson for the land, and against them, in the statutory form, for the value of permanent improvements in favor of Glidden & Sanborn. The judgment also contained the following clause:

"It is further adjudged and decreed by the court, that the defendants J. F. Glidden and H. B. Sanborn do have and recover of the Houston & Texas Central Railway Company and of the receivers, Charles Dillingham, James Rintoul, and N. S. Easton, as receivers of the properties of the Houston & Texas Central Railway Company, and to be satisfied from any of said railway's property in their hands and embraced under the mortgage of July, 1866, or the proceeds thereof, and of James Rintoul and N. S. Easton, as trustees in the mortgage of July, 1866, as above shown, and to be satisfied from any property subject to said mortgage, or the proceeds thereof, before the same or any part thereof is paid to the cestuis que trust under the mortgage of July, 1866, the sum of $14,628.96, with interest from this date until paid, at the rate of 8 per cent per annum. And it is adjudged by the court, that said sum is a superior lien to the lien of said mortgage, and is first to be satisfied out of the said properties or the proceeds thereof in the hands of said receivers."

The judgment awards Glidden & Sanborn execution against the trustees and receivers for the amount recovered on the warranty and for their costs of suit, "to be satisfied out of any property subject to said mortgage or any proceeds thereof, and before the same is paid to said trustees or to the cestuis que trust under said mortgage of July, 1866. But the equitable control of said properties by the United States Circuit Court for the Eastern District of Texas shall not thereby be disturbed."

The judgment in favor of Glidden & Sanborn against the Houston & Texas Central Railway Company, upon its warranty, and against Gunter & Munson for the value of improvements, was warranted by the pleadings and evidence, and there does not appear to us to be any valid objection to it in either particular. The view that we take of the judgment, in so much as it affects the receivers and trustees, renders it unnecessary and improper for us to consider any question with regard to the validity or priority of liens claimed by Glidden & Sanborn. Those questions belong to the cause pending in the United States Circuit Court, which has also, through its receivers, the custody of the property now in controversy, and which is subject to its own independent control through its own final judgment.

If the necessary parties were before this court, which we by no means intend to imply, no judgment that we could render would control or in the slightest degree affect the final decision of those issues.

Without any power to enforce it in the least particular, the judgment of the District Court with regard to the disposition by the trus-

tees and receivers of the property under their control can not amount to anything more than a mere expression of its opinion or advice to the United States Circuit Court with regard to the proper exercise of its own jurisdiction. The courts of this State are not organized or held for such purposes, and they will not undertake the exercise of such functions.

If there shall be found to be any fund in its control subject to appropriation upon the judgment in favor of Glidden & Sanborn, the United States Circuit Court will doubtless, upon an application made to it for that purpose, so direct upon the judgment here rendered against the railway company.

The judgment will be reversed in so far as it relates to the trustees and receivers, and the cause as to them dismissed. The judgment will be in all other respects affirmed.

*Affirmed.*

Delivered June 26, 1891.

CHIEF JUSTICE STAYTON dissenting.

A motion for rehearing was refused.

DISSENTING OPINION.

STAYTON, CHIEF JUSTICE.— Not being able to concur with the majority in some of the rulings made in this case, I deem it proper to state some of the grounds of my nonconcurrence.

I do not understand the holding to be, that the field notes returned into the General Land Office for the Houston & Texas Central Railway Company were void because not based on an actual survey of each of the four lines of every section embraced in the block. If such were the holding, it would be useless to refer to decisions made under laws in force prior to the adoption of the Revised Statutes for the purpose of showing that the rulings of this court have in all preceding cases been to the contrary. These decisions are well known to the profession, and to establish a different rule now would be attended with consequences so disastrous to the public welfare, peace of society, and private rights, that no court would be authorized to do so, even if originally such a rule might have been more in harmony with the statutes.

The District Court held, "that the northeast corner of section No. 1 being the only point called for in the railway company's original location that can be identified on the ground, this block of surveys must be located by running west from this point and tying each succeeding survey to the one preceding it; and that the only way to do this is to cross the river at 109 and locate the succeeding sections from three to

five miles north of the river, and as thus located no part of the land in controversy would be included. I conclude that if it were possible to locate on the ground any point called for in the field notes of 109 so as to give it the river for its north line, it would be necessary so to locate it from such point; but it being impossible to do this, as shown by the findings of fact, the remainder of this tract must be located as above set forth."

I understand the ruling in this court to be, not that any of the surveys are void either for uncertainty of description or illegality, but that their true locations must be fixed as were they in the District Court—that the call for front on the river must be disregarded and the several surveys located in accordance with their calls for connections with each other. My mind does not assent to this proposition, nor to the proposition that it is impossible "to locate on the ground any point called for in the field notes of 109 so as to give it the river for its north line."

The question then becomes one of locality; and it is freely conceded, that if the field notes under which appellants claim do not place the land claimed by them on the south bank of the Canadian River, when construed as the law requires them to be, then appellants have no rights in any of the lands claimed by appellees.

That the question involved may be fully understood, a sketch is here given, showing by the blue line the Canadian River with its meanders as they were supposed to be, and with reference to which the field notes of every section from No. 1 to No. 158 inclusive were made for the railway company. The red line shows the river with its meanders as they are shown actually to be by a subsequent survey. This sketch is correct in all respects in so far as it shows the supposed and true general course and meanders of the river, and the relation of the several surveys to it, if they be placed on its south bank.

I also attach another sketch, which will show on a larger scale that part of the river on which it is claimed the break was made between surveys 108 and 109, the surveys as they were represented on the river by field notes and map under the original surveys, and the line of the river as it was then understood to run. The latter is marked in blue. This sketch also represents, with the red line, the river with its meanders as determined by subsequent survey, and the several surveys thereon from 90 to 114, as they were established by accurate resurvey.

The point at which survey No. 1 began is established on the ground, and was at the time the field notes were made out; but no corner of any succeeding survey was actually established. Each succeeding survey as they extended westward and up the river called for the survey just below it, and to front 950 varas "on the south bank of the Canadian River." The side lines of each survey called to run north and south, and the back lines east and west. Each survey was for a sec-

tion of land, the alternates being for the school fund, and the front given on the river was as required by the statute.

It is not denied that the field notes of the several surveys from No. 1 to 108 are in all material respects correct, and this will be seen to be true from inspection of the sketch already given; but it is claimed that the last named survey according to its calls will cross the river, and that all following it westward must preserve their connections with it, and thus follow to the north side of the river.

The land in controversy begins at survey No. 120, as shown on the sketch, and extends up the river and westward; and from this it will be seen that the true position of survey No. 109 only becomes important to determine the true position of the surveys above it. If that survey is on the north side of the Canadian River, the same facts which place it there will place all the block of surveys west of it on the same side of the river; and in that event the judgment is right. It seems to be conceded, that if that survey is on the south bank of the Canadian River, the surveys for the railway company west of it can and must be located on that bank, and follow each other in the order of their numbers. In the latter event the judgment is erroneous.

The first inquiry arising is, Do the field notes made for the railway company, each one successively calling for the one below it as they proceed westward, furnish data from which the true location of survey No. 109 as well as every other one of the surveys may be fixed with certainty on the south bank of the Canadian River? With a view to this inquiry, it will be assumed for the present that the call of every one of the 158 surveys to front "on the south bank of the Canadian River" can not be entirely disregarded. The original course of the Canadian River, as will be seen from the sketch, is northeasterly. All the side lines of the surveys call to run north and south and the back lines east and west. The sum of the westings from the lower corner of the survey No. 1 to the upper line of survey No. 158 will give the length of the line run due west from the lower corner of survey No. 1 on the river, from the western terminus of which line a line run due south to the south bank of the Canadian River will give with mathematical certainty the upper corner on that river of survey No. 158. A repetition of this process at every 950 varas westward from the lower corner of survey No. 1 will give a common corner of two surveys until the upper corner of survey No. 158 is reached. This is illustrated on the preceding sketch, from which it will be seen that a line due south from a point 102,600 varas west from the lower corner on the river of survey No. 1, where it touches the south bank of the Canadian River, will fix the lower corner of survey 109. Thus will be established the upper corner, on the south bank of the river, of survey No. 158. The westings to upper corner of No. 158 from lower corner of No. 1 must be $950 \times 158 = 150,100$ varas; to upper corner of No. 109 must be $950 \times$

109 = 102,600 varas.   To controvert these propositions is to deny a mathematical truth.

It will then be assumed, that from the field notes it can be ascertained at what point on the south bank of the Canadian River the corners of any one of the 158 surveys are to be placed, if it be lawful to place the upper corners of each survey on that bank of the river under the facts found in the record.

Do the facts require the upper corners of all the tracts for which field notes were made for the railway company to be placed on the south bank of the Canadian River? The field notes say so; but it is held that they must be disregarded in this respect, while effect is given to them in others.  The findings of fact by the court below necessary now to be considered consist to some extent of conclusions of law; but so far as they deal with fact, do they justify the legal conclusion reached? The finding was, that "the surveys from 1 to 108 inclusive can be located without any great variation from the field notes returned by Maddox as above, although in no case except section No. 1 would such field notes be strictly correct, and in a great number of surveys the meanders of the river and length of east and west lines would have to be radically changed; but when 109 is reached, owing to a sudden bend in the river to the south, and in some cases a little southeast of south, it is impossible to connect this section with section No. 108 without placing it in and on the opposite side of the river, and it is impossible to locate 109 so as to make the river its north line without dropping from two and one-half to three miles south of the south line of 108, where the river again turns west, and there make a new beginning with nothing to locate it by, and all surveys west of this would be dependent upon this new beginning point.  The land in controversy in this suit commences at 120 as it would be thus located and runs west with the surveys as they would be located by the Maddox field notes calling for 108, as above set forth."

I fully concur with the proposition that it is impossible to connect section 109 with section 108 without placing section 109 on the north side of the Canadian River; and go further, conceding that it can not be legally connected with that section at all, for the simple reason that section 108 can not cross the Canadian River, that being a navigable stream within the meaning of the law.   But it does not follow because such a connection can not be made that section 109 and all other sections west of it may not, under the facts, be made to front on the south bank of the Canadian River, just as the field notes declare they do.   I further concede, that it is impossible to locate section 109 so as to make the river its north boundary without dropping from two and a half to three miles south of the south line of 108 to a point where the river again turns west, if we wish to get 640 acres in the survey, and to surrender the land above the point where the river again turns abruptly

to the west, looking toward its source; but I do not see that this affects the question to be decided, unless it be the law, as held by the court below and by this court, that the location of the surveys must depend on their successive connections and on their back lines, disregarding the calls to front on the river. The proposition, however, that what in the finding is said would be a new beginning corner, if section 109 be made to front on the south bank of the river, would have nothing on which to base its location at that place, is not conceded; for, as we have before seen, it can be so located with absolute certainty unless facts hereafter to be referred to forbid this.

It seems to be conceded, if any survey made for the railway company above the point where the river, looking downward, makes the abrupt bend to the north, can be fixed on the south bank of the river, that then the surveys west of that, or up the river, must be constructed on the survey so fixed, and will appropriate the land in controversy. All the surveys above survey 109, as has been before seen, are placed on the south bank of the river by the same facts that place any one of them there; and it would perhaps avoid all questions if we do not give so much weight to the true position of survey 109 as seems to have been given to it in the court below, for it may be that section 108 and section 109 under their field notes could not be given the quantity of land called for. Section 108, before reaching the width called for in its field notes, was cut off to the west by the river, which it could not cross, and it was cut off to the south by the river touching the western boundary of section 107, while section 109 would have its full front on the south bank of the river in a bend which would extend eastward more than the width of the survey before reaching the abrupt bend to the west, looking up the river. These matters, however, could not affect the true position of section 110, nor of any section west of that.

It is said that no actual surveys were ever made, and that must be conceded to be true, if the word be used in its ordinary sense; and it is further said, that no description of the lands, either accurate or inaccurate, can be found in the surveys. We must look to the field notes to ascertain whether they give any or an accurate description of the several tracts of land, and when in succession one calls for another we may and must look to all preceding surveys to fix the locality of the last, unless this is otherwise fixed. We must also look to them to determine what the intention of the surveyor was, for his intention operative in law must be ascertained from the field notes which he made out to describe the land in each of the tracts, aided by such extrinsic evidence as may be admissible for the correct application of the field notes to the land; and no mere secret intention on the part of the surveyor can have any effect.

The field notes after those for section No. 1, which it is conceded is fully identified and properly described, in succession as they extend

up the river westward, call for the northwestern corner of the preceding survey. In form the field notes of the several surveys do not differ, except that the meanders of the river fronts and length of the side lines to conform to this differ in length, and as a sample the field notes of survey 108 will be given. They are as follows, so far as necessary to be given: "Situated in the Panhandle, in Jack District, about 41½ miles above Bent's Fort, on the south bank of Canadian River, and known as survey No. 108, in block No. 46, beginning at a mound the northwest corner of survey No. 107; thence with river south 70 degrees west 600 varas, south 351 degrees west 672 varas to mound on river; thence south 3303 varas to mound; thence east 950 varas to mound; thence north 4059 varas to beginning."

Each survey is 950 varas wide, and each contains the declaration that the land is situated "on the south bank of the Canadian River." That the surveyor intended it should be is conclusively shown by the field notes he made, and that any one of the field notes fails to describe the tract of land to which it applies certainly does not appear upon the face of the field notes of any particular survey or upon the face of all of them considered together. Surveys 108 and 109 may not entitle their owner to take as much land as they call for, simply because they can not be extended across a navigable stream; but this does not affect other surveys or make their localities in any respect uncertain, for we know the westing it was intended these two surveys should cover.

That it was the intent of the surveyor to make the surveys join by calling in each succeeding one for that which preceded it ought not to be denied; but does it follow from this that the calls for each survey to front on the south bank of the river should be disregarded, when it appears clearly that the call for surveys 108 and 109 to join for the distance of 803 varas was by mistake, based on want of correct information as to the length of an abrupt bend in the river? Upon this question rests the decision of the branch of the case now under consideration.

It is held by the majority, that the difficulty arises from a mistake on the part of the surveyor, and that is readily conceded; but the inquiry arises, whether this mistake was as to the existence of the river and its general course or as to its course at a particular point; and as to this it seems there ought to be no controversy. If the mistake was as to the matters first named, there might be some plausibility in holding that the surveys should be located in accordance with the calls for contiguity, although the evidence clearly shows that the side and back lines were never surveyed; but that mistake in either of these respects existed can not be held in the light of the evidence contained in the record. That the existence and general course of the river was known is placed beyond question. The surveys began on its bank; it had been

imperfectly meandered before the field notes were made out, and that this was substantially correct at all places save one for a distance of seventy-eight miles is manifested by the sketch before referred to, which shows the meanders of the river as they were supposed to be when the field notes were made out, and as since found to be upon an accurate survey. At the time the field notes were made out its course was so well known that the surveys from 1 to 108, and from 110 to 158, were so accurately described on their fronts that the court below and this court evidently would have held them all-sufficient but for the supposed break in contiguity between numbers 108 and 109.

When it is evident that a survey or block of surveys is in some respect erroneous in calls, and that this results from mistake as to a particular fact, ought not effect to be given to what clearly appears to have been the leading intention, rather than to defeat that because of an inaccuracy brought about evidently by mistake as to some particular fact not bearing on the mere specific intent manifested? Was it the intent of the surveyor to embrace within the 158 surveys the entire front on the south side of the river, from the lower corner of survey No. 1 to the upper corner of survey No. 158, or was it the intent to have the surveys contiguous although they might not reach to the river or might cross it and lie several miles to the north of it, where the same surveyor for the same owner had made other surveys by virtue of other certificates? The field notes settle that question, for together they call for the entire south front on the river for seventy-eight miles. The plat of the block sent to the Land Office showed the surveys to front on the south bank of the river, and so they appeared on the maps of the General Land Office as well as on those of the land district.

The law settles that question, for in determining the locality of a survey, in the absence of evidence showing that the call was made through mistake, it recognizes the propriety of giving more weight to such a call as evidence of intention than does it to some call for a point determined or to be determined only by course and distance. The surveys were each given the front on the river which the law permitted them to have when fronted on a navigable stream, which made them long and narrow; and it may be asked whether this was done because it was intended each survey should front on the river, or because it was possible some river might be found in the distance called for from the back line of each survey on course called for.

No case other than this can be found in which it was held that a line never in fact established, and susceptible of establishment only by course and distance, should control a call for a river, unless it was shown that some other stream was mistaken for the river called for, and especially so when the river is made the starting point from which course and distance must run to fix the back line. Nor can a case be found where failure in whole or in part of a call or calls for lateral contiguity of

two or more surveys, all calling to front on the same river, has been deemed sufficient to justify a court in disregarding the call for a river because otherwise the contiguity called for can not be given.

All the surveys are the same width, but the lines running north and south of the same surveys and of different surveys are of different lengths very frequently; and this results from no other fact than that regard was had to the meanders of the river as they were understood to be; and in view of this fact it can not consistently be held that the river was called for as the front of every survey, in connection with the other calls in any one survey or in all the surveys, because the true position of the river was unknown, or thought to be unknown. The river was called for because its position was believed to be known, and was known with reasonable certainty at all places but one, and the difference in the lengths of lines running north and south was made because of that belief and knowledge, in order to include in each survey 640 acres of land, which made it necessary to calculate the quantity of land in the bends of the river in front of each survey. The river was called for as the northern boundary of every survey, not because it was erroneously believed that under other calls each survey would reach the south bank of the river, but because it was intended the river should be the northern boundary of each survey, and to disregard it and build the surveys on lines never established and that can be established only by measurement from the river on a course due north, is, in effect, to sacrifice the real and known to that which can become real by its ascertained relation to the thing disregarded.

It is true, that the calls for the river or the calls for connection of the surveys on each other at one place must give way, and which under the facts of this case should yield ought not to be deemed a debatable question on reason or authority. Phillips v. Ayres, 45 Texas, 601; Jones v. Andrews, 62 Texas, 652; Booth v. Upshur, 26 Texas, 64; Boon v. Hunter, 62 Texas, 582; Railway v. Thompson, 65 Texas, 186. In some of these cases calls for older surveys as contiguous were disregarded, because shown by the other evidence to have been made by mistake.

The rules laid down in Robinson v. Doss, 53 Texas, 508, have always been recognized in this State; but when applied in this case, can it be said that there is any more certain and reliable evidence of the true locality of the northern boundary of each of the surveys than the call for the south bank of the river made in the field notes, which must evidence what the intention was? In the case referred to it seems to have been contended, that the intention of the surveyor could not be looked to in a case in which an actual survey was not made; but in reply to that this court said: "Appellees assert that an office survey —a survey not actually made—can not be made to conform to the intention of the surveyor;" citing Chinoweth v. Haskell, 3 Peters, 92.

That case does not establish the rule that the intention of the surveyor is to be disregarded as to the location of lines not actually run. It announces and enforces a rule applicable to all cases, that 'the intentention of a surveyor can be of no avail, since he has not indicated this intention on his survey.' On the other hand the authorities show, that although the survey was not actually made, we are still to seek for the intention of the surveyor. Says Judge Marshall, speaking for the Supreme Court of Kentucky: 'This is not a question of tracing an actual boundary or of discussing a lost one, or one which may be presumed to have been completed; but of constructing a survey by adding two lines which were never actually run; and the cardinal object is, to ascertain what the surveyor would have done if he had gone on to complete the work. Citing 2 Bibb, 493. *This is to be ascertained not by vague conjecture, but by rational deductions from his report, as compared with existing facts.*' Ralston v. McClurg, 9 Dana, 339; see, also, Phillips v. Ayres, 45 Texas, 607; Booth v. Strippleman, 26 Texas, 441; Booth v. Upshur, Id., 72, 73.''

In the case of Allen v. Koepsel, 77 Texas, 507, it was shown, that a title called for the Guadalupe River for the eastern boundary; but there was evidence tending to show that the surveyor who made the survey on which the title issued mistook a slough or old channel of the river for the river, and meandered and described that in his field notes. Under such a state of facts it was held, that it was proper the jury should determine whether the slough or the river was the original line established by the surveyor.

In Land Company v. Thompson, 83 Texas, 169, it appeared that a surveyor in making out field notes, where no actual surveys were made, called for Devil's River for such of them as he supposed crossed that river (a navigable stream), but he in fact mistook a canyon for Devil's River, and from his calculations placed the surveys so as to make that sustain the relation to them which the supposed Devil's River would. Under that state of facts it was held, that the call for Devil's River would not control the calls for course and distance from established points.

These cases but hold, that a mistake in a call for a river may be shown as may be a mistake in reference to any other call for boundary; but there can be no just claim in the case under consideration that the surveyor was ignorant of or mistaken as to the existence of the Canadian River or as to its general locality; and his constant assertion, made in reference to every survey, that it began and fronted on the south bank of that river, ought, in the absence of some evidence tending to show mistake as to these matters, to be held conclusive of that fact, and all inferior calls be made to yield.

Believing as I do that in law and fact all the surveys made for the railway company fronted on the south bank of the Canadian River,

the question whether the resurveys that were made after the mistake in the length of the bend in the river was discovered should be treated as corrections or relocations, ought to depend on whether they embraced land not embraced in the first field notes.   As the surveys were not based on files, the railway company could not take under them lands not embraced in them.   If, as bounded by the field notes, any survey, on account of mistake as to the meanders of the river on its front, did not contain 640 acres of land, this was the misfortune of the company, and it could not extend the boundaries so as to embrace the area intended; and especially so as against a person who had acquired right to land that would be brought in by the new survey.   If, however, on account of mistake in the meanders of the river, or by mis- calculation, the field notes first made out embraced more than 640 acres in a survey, I see no reason why the field notes might not be so corrected as to exclude all in excess of that which could be lawfully appropriated under a particular certificate.   This would be essentially a correction, and not a relocation.   The cases of Adams v. Railway, 70 Texas, 265, and Railway v. Thompson, 65 Texas, 186, assert no contrary rule.   The fact that a surveyor might embrace by mistake, however brought about, more land in a survey than the certificate by virtue of which it was made called for, would not invalidate the survey and leave all the land subject to appropriation by another person; but in such case it would be manifestly just to the State, as well as the owner of the land claim, to permit the survey to be so corrected as to embrace only the proper quantity of land.

Under the view taken by the court of the proper method of locating the original surveys, the last surveys made for the railway company would necessarily be relocations, for they would appropriate lands south of the river, while it is held the original surveys covered lands several miles north of the river.

Without wishing to discuss the question of estoppel, I do not wish to be understood to concur in the legal propositions asserted on that branch of the case.   If facts exist which would estop John W. Maddox from asserting title to the land were he in the place of the appellees, then I am of opinion they should be so held; for their obligation to the railway company to cause the lands to be so surveyed and described in field notes returned to the General Land Office, that the company through them should acquire title, was as absolute as though the contract had been made with them directly.   They and Maddox were parties under a written contract made before the certificates were received for location; they knew of the contract under which they were received, and, with Maddox, entered upon its performance; and the fact that they were not known to be in partnership with Maddox, that they were not personally trusted, can not make their relation to the railway company less fiduciary than would it have been had the contract been made with

them, so far as they are concerned. They undertook the obligation in the contract with Maddox, that "the surveys are to be made in a good, practical manner, and as well marked on the ground and identified in the field notes as is necessary and the nature of the country will admit." It was their duty to comply with this, and I am not willing to hold if Maddox would be estopped that they would not be; when, if their contention be sustained, it appears that they received compensation for making and returning the surveys, and must be held through Maddox to have represented that the field notes were absolutely correct in all material respects. It was their duty to see and to know that Maddox in no way permitted a misrepresentation to be made to the company in regard to the surveys.

In the proposition, that they must have been personally trusted or estoppel could not arise, I do not concur, in view of the relations shown to have existed between them and Maddox. Nor do I concur in the further proposition, that if fiduciary relations between appellees and the railway company were necessary to create an estoppel, that this relation was not in full force at the time appellee sought to acquire title to the land. If, however, estoppel exists against any party to the transaction, it does not necessarily follow that this must be based on any fiduciary relation. It may be rested upon the familiar rule, that one who knowingly makes to another a false representation in reference to a material fact, or causes such a representation to be made, with intent that such representation shall be acted upon, will be estopped, if the person to whom the representation is made is, without fault, ignorant of the falsity of the representation and relying upon its truthfulness acts upon it.

The field notes made out and returned to the General Land Office under the supervision of Maddox and appellees, showed not only perfect surveys fronting on the south bank of the Canadian River, in which the meanders of the river were given, but they had attached to them certificates which declared, "that the foregoing survey was made on the ground according to law, and that the limits, boundaries, and corners, with marks natural and artificial, are truly described in the foregoing plat and field notes." Were these certificates and the field notes false? Appellees base their case on the fact that they were. Did they know that they were false? If false, the evidence of both Maddox and Munson, two of the partners, shows that they knew the certificates were false. Was the representation of one partner the representation of all? Necessarily so, in a business transaction to which the partnership was a party. Was it intended that the railway company should act upon the representations contained in the field notes and certificates? There can be no doubt of that. Did the company act upon these representations in ignorance of their falsity? The evidence would sustain a finding that it did, though there was

evidence from which an inference might be drawn that its agent had reason to believe that the surveys were not actually completed on the ground, though none to induce the belief that the surveyor and Maddox and Munson had not sufficient data to correctly describe the land in each survey.

Under the rulings in this case, what must be the effect of the company's reliance on the representations made? The result of the litigation answers the inquiry.

Having a deep conviction that this case has not been decided in accordance with the settled rules of law or with the rights of the parties, I have deemed it proper thus to present some of the grounds for my nonconcurrence in the disposition made of it.