BACON AND GRAVES ET AL. V. THE STATE OF TEXAS.

No. 342.

1. **Survey of Public Land—Office Survey Invalid, When.**—Article 3908 of the Revised Statutes requires a survey of public land to be actually made on the ground, and the State can not, in opposition to its wishes, be compelled to accept an office survey constructed by merely copying and adopting the field notes of a previous survey made on the ground for other parties by other surveyors.

2. **Same—Survey Under Fifty-Cent Act.**—Such office survey, made by adopting prior field notes, is not sufficient to enable a purchaser to enforce against the State an executory contract for the sale of public lands under the "fifty-cent" Act of July 14, 1879, as amended March 11, 1881, even though it might constitute a valid survey should the officers of the State see proper to so recognize it, or might not be such a nullity as could be taken advantage of by third persons.

3. **Trespass to Try Title—Scope of Action.**—The State may properly bring suit in the form of an action of trespass to try title to cancel, on the ground of illegality and fraud, a contract for the sale of its public lands, although patents have not been issued to the purchaser for the lands.

4. **Same—Description of Lands Sued for.**—In such an action it is sufficient if the petition gives substantially the same description of the lands as contained in the defendant's application to purchase them, especially where the defendant's answer contains such a description of them as will serve as a basis for the judgment rendered.

5. **Cancelling Sale—Tendering Back Purchase Money.**—It is not now an open question, that in an action brought to cancel an illegal sale of the public lands the State is not required to tender back the purchase money it may have received.

6. **Purchase of Public Land by Employe of State.**—See the opinion for evidence held sufficient to sustain a finding that G. was an employe of the

General Land Office at the time he entered into a contract with B. for the joint purchase by them of public lands, and that his resignation as such employe was in pursuance of such contract and understanding.

**7. Purchase Under Fifty-Cent Act—Responsibility of Purchaser.** Under the "fifty-cent" Act of July 14, 1879, providing that public lands might be purchased "by any responsible person," the question of such responsibility was for the surveyor to decide; and if he held the party to be responsible, and made the survey for him. this would be sufficient to hold the land until the expiration of the time allowed by law for paying the purchase money to the State.

**8. Same—Invalidity of Part of the Surveys.**—Where a party applied under the "fifty-cent" act to purchase a number of surveys, the fact that some of them were illegally made, because having too great a frontage on permanent water, would not invalidate the others, since each survey of 640 acres must, under the terms of that act, be treated as a separate purchase.

**9. Same—Tender on only Part of the Surveys.**—For the same reason, it must be held that the failure of the purchaser to tender payment on all the surveys made under his application would only have the effect to invalidate such part of the proposed purchase as was not covered by the tender.

**10. Same—Tender Made in Time.**—Where the application to purchase under the "fifty-cent" act was made December 1, 1882, and the lands were surveyed January 17 to January 22. 1883, and the field notes were filed in the General Land Office in March, 1883. a tender on May 19. 1883, of the purchase money due thereon to the State was made in time, although the act was repealed January 22, 1883; and the State Treasurer could not defeat the applicants' right of purchase by refusing to receive the money. Following Cattle Company v. Bacon, 79 Texas. 5.

**11. Evidence — Certificate of Commissioner of General Land Office.**—While it was error to admit in evidence a certificate of the Commissioner of the General Land Office, stating that he had made search in the General Land Office for the field notes of certain surveys, and had been unable to find them, and that they were not in the files of said office, "and were never filed in the Land Office at Austin," yet such error was not material in this instance, since all of such field notes being illegal, their filing, if made, could have conferred no rights, and the entire case is disposed of on other issues.

Appeal from Mitchell. Tried below before Hon. Wm. Kennedy.

The trial court's findings of fact, adopted in the opinion, and also its conclusions of law, several of which are referred to therein, are as follows:

"1. On December 1, 1882, E. M. Bacon and E. G. Graves made application to Joel McKee, who was then the surveyor of the Palo Pinto Land District, as such surveyor, to purchase the land in controversy, under what is known as the fifty-cent act, approved July 14, 1879, and amended March 11, 1881, which said application was received and recorded by said surveyor on said day.

"2. The land so applied for was situated at the time of application in the Palo Pinto Land District, and the said surveyor was the proper officer to whom application for the purchase of the same should have been made.

"3. Bacon and Graves paid the fees for filing the field notes in the General Land Office entirely within the time required by law.

"4. By the records of the Land Office, the 117 sections of land of block B of the alleged Bacon and Graves survey purport to have been surveyed by H. M. Berry, deputy surveyor, on January 17, 18, and 19, 1883; that the field notes of said sections were recorded in the surveyor's office on the 14th and 18th days of March, 1883; that said field notes were returned to the General Land Office March 17, 1883; and the chain carriers who purport to have assisted said Berry in making said survey are J. H. Miller, J. B. Pierce, Andy Burns, Ed. Wagner, and H. C. Reed.

"5. By the records of the Land Office, 91 sections of land of block G of the alleged Bacon and Graves survey purport to have been surveyed by H. M. Berry, deputy surveyor, on the 18th, 19th, 20th, and 22d days of January, 1883. The field notes thereof were recorded in the surveyor's office on March 14 and 15, 1883, and were returned to the General Land Office on March 17 and 20, 1883.

"6. By the records of the Land Office, the remaining 200 sections of block G of said survey purport to have been surveyed by E. A. Williams, deputy surveyor, on January 17, 18, 19, and 20, 1883. The field notes thereof were recorded in the surveyor's office on March 14 and 15, 1883, and were returned to the General Land Office March 17 and 20, 1883.

"7. By the records of the Land Office, 25 sections of block M of said survey purport to have been surveyed by H. M. Berry, deputy surveyor, on January 22, 1883. Field notes duly recorded in surveyor's office March 14 and 15, 1883, and returned to the General Land Office March 20, 1883—except the field notes of sections 26, 27, 28, 29, 30, 31, and 32 of said block M, which were never returned to the Land Office.

"8. By the records of the Land Office, the remaining 94 sections of said block M purport to have been surveyed on January 20, 21, 22, and 23, 1883. The field notes thereof were recorded in the surveyor's office on March 14, 16, and 17, 1883, and returned to the General Land Office March 20, 1883.

"9. That by the records of the Land Office, sections 33 to 68, inclusive, of block M, purport to have been surveyed by E. A. Williams on January 21, 1883. January 21, 1883, was on Sunday.

"10. By the records of the Land Office, sections 251 to 291, inclusive, of block G, and sections 1 to 25, inclusive, of block M, and section 115 of block M, purport to have been surveyed on January 22, 1883. And by the records of said office, sections 99 to 114, inclusive, and sections 116 to 126, inclusive, of block M, and sections 1 to 12, inclusive, of block N, which latter are in block 27, Houston & Texas Central Railway survey, purport to have been surveyed January 23, 1883.

"11. By the records of the Land Office, sections 1 to 12, inclusive, of block N, purport to have been surveyed by H. M. Berry, on January 23, 1883. The field notes were recorded in the surveyor's office March 14 and 16, 1883, and were returned to the General Land Office March

20, 1883. That sections 13 to 27, inclusive, of said block N, also sections 41, 42, and 47, purport to have been surveyed by Benjamin Boydston on January 20, 1883, and field notes returned to the Land Office March 20, 1883.

" 12. By the records of the Land Office, sections 28 to 40, inclusive, sections 43 to 46, inclusive, and sections 48 to 52, inclusive, of block N, purport to have been surveyed by Benjamin Boydston on January 21, 1883, and field notes returned to the Land Office March 20, 1883.

" 13. The surveyor of Palo Pinto Land District certified to the respective surveys herein before mentioned on the days said surveys purport to have been made.

" 14. None of the land included in this suit has ever been patented by the State under the Bacon and Graves purchase; and on the 26th day of May, 1890, Bacon and Graves transferred by deed of special warranty 579 sections of land to C. C. Gibbs, who holds the same as trustee for E. M. Bacon and E. G. Graves and others.

" 15. I further find as a matter of fact, that none of the land in suit was actually surveyed upon the ground by the deputy surveyor who purported to have done so; but they merely copied in the office of the surveyor of the Palo Pinto Land District the field notes of the ' Elgin survey.'

" In July, 1873, the Houston & Texas Central Railway Company located certificates in Scurry, Borden, Howard, Kent, and Fisher Counties, on lands known as blocks 27 and 97 of the Houston & Texas Central Railway Company survey, including that sued for herein, which said block 97 comprises surveys from 1 to 955, all of which were by virtue of land certificates issued to said company by the Commissioner of the General Land Office of the State of Texas, and the field notes thereof bear date 'July, 1873,' and were returned in the surveyor's office during the month of ———, 1873, and were filed in the General Land Office November 20 and 26, 1873; and all the lands in this suit were and are within the Texas & Pacific Railway 80-mile reservation, marked by the act of the Legislature passed May 2, 1873.

" The above survey is the ' Elgin survey,' the field notes of which were adopted by the surveyor of Palo Pinto Land District and his deputies in making out the field notes of the land applied to be purchased by Bacon and Graves. Blocks 97 and 27 were actually surveyed on the ground by Elgin in the manner in which it has been customary by surveyors in Texas to survey large bodies of land; that is, by running the outside boundary lines of the blocks, or a part of them, putting up permanent landmarks, and leaving the interior lines without running. These blocks, in writing up field notes, were divided into 640 acres surveys, and the interior surveys were made without actually running the lines; and Elgin did not run all the lines of any section in blocks 27 and 97, unless, as he

says, it was done by accident. The field notes of said blocks 27 and 97 have remained on file in the General Land Office since they were filed therein, and said lands are platted on the maps of said office. There are 33,280 acres of land in block 27, and 611,000 acres in block 97.

"16. Deputy surveyors Berry and Williams had, prior to the adoption of the field notes for Bacon and Graves, run lines and ascertained corners in blocks 27 and 97, and found them to be as correct as any work of that character in that part of the State, and were satisfied as to the substantial accuracy of said surveys. Said surveys, as far as marked lines and corners were concerned, and in accuracy of work, were equal to or better than any other surveying in that part of the State, except that done for the Texas & Pacific Railway, which was unusually accurate.

"17. In December, 1882, and in January, February, and March, 1883, Joel McKee was the surveyor of the Palo Pinto Land District, and E. A. Williams and H. M. Berry were deputy surveyors under him.

"18. I find, that at the time E. G. Graves entered into the agreement with E. M. Bacon to purchase these lands, to-wit, on the 29th and 30th of November, 1882, he was an employe in the General Land Office at Austin as draftsman, and that he drew his salary for the entire month of November, 1882, as well as for the preceding ten months.

"19. Bacon and Graves have neither paid nor offered to pay taxes on said land or any part thereof at any time, nor have they rendered any part of such land for taxes for any year, except for 1891, when it was rendered by C. C. Gibbs, trustee.

"20. Bacon and Graves, at the time of the application by them to purchase said lands, were not responsible parties, being worth less than $3000 each, and had made no arrangements to procure more than enough money to pay for the filing, etc., of the field notes, and afterwards, in February or March, 1883, the promise of a loan of $5000.

"21. The Colorado River is one of the great rivers of the State. It runs through about twenty sections of block 97. It is not a navigable stream where it flows through said block, but it is permanent water.

"22. The Elgin survey of block 97, adopted by the deputy surveyors, Williams and Berry, is not made in conformity to the fifty-cent act of 1879 and its amendment in 1881, as the surveys made on the Colorado River, which is permanent water, cross the same and have a greater frontage thereon than one-half the square of such survey, and that, too, where they are not surrounded by older surveys.

"23. On the 16th of May, 1883, Bacon and Graves tendered to the Treasurer of the State $80,640, and on May 19, 1883, tendered to said Treasurer the further sum of $104,640, in payment of surveys numbers 118 to 291, inclusive, block G, in Borden and Scurry Counties; surveys numbers 1 to 119, inclusive, block M, Scurry County; surveys numbers 1 to 52, inclusive, block N, Scurry County; surveys 1 to 117, inclusive,

block B, Scurry County; and surveys 1 to 135, inclusive, block G, Borden and Scurry Counties; which said tenders were refused and declined by said Treasurer. In January, 1891, Bacon and Graves paid to said Treasurer on said lands $149,320, which was received by him under protest.

" 24. In December, 1882, the land in controversy was worth $1 per acre. At present it is worth $2 per acre for dry land, and $3 per acre for watered land.

" From the foregoing facts I conclude, that the plaintiff, The State of Texas, is entitled to recover in this suit on each of the following grounds, to-wit:

" 1. Bacon and Graves were not responsible parties at the time they applied to purchase this land, and could not purchase under the law.

" 2. They did not comply with the law by having the land surveyed as was required by law, and therefore could not purchase it.

" 3. The survey as adopted was not made in accordance with law; is incorrect—totally so—in having a greater frontage on permanent water than is permitted under the Acts of 1879 and 1881.

" 4. Bacon and Graves have never paid or offered to pay for said land until long after the expiration of the time allowed and required by law. The purported surveys of many of the sections of land, for which they tendered payment on May 19, 1883, were made after the fifty-cent act was repealed, and Bacon and Graves did not separate or offer to separate, in their tender, the surveys made before the repeal from those made after, and there was consequently no legal tender.

" 5. At the time Graves entered into an agreement with Bacon to purchase these lands, he was an employe of the General Land Office, and his action was against the civil and criminal laws of the State.

" 6. I further hold that the State is not bound to return the money paid in January, 1891, to entitle it to a judgment for the land."

*T. D. Cobbs*, for appellant C. C. Gibbs; *Hancock, Shelley & Hancock, R. H. Looney*, and (on motion for rehearing) *Walton, Hill & Walton*, for appellants, Bacon and Graves.

1. *Validity of the Surveys:*  A legal survey is a description of land for its identification, rather than the actual work done by the surveyor to enable him to give such a description.  Thomson v. Railway, 68 Texas, 393.

2. The surveys made for Bacon and Graves in this case were in strict compliance with the law; and if not so made in all respects and particulars, they can not be made to suffer for the acts of the public officer. Rev. Stats., arts. 3894–3896, 3906, 4025–4029; Act Feb. 20, 1879, sec. 8, p. 10; Act July 14, 1879, sec. 7, p. 49; Act April 2, 1887, secs. 2, 3, p. 107; Act March 26, 1881, sec. 6, p. 66; 1 Sayles' Early Laws, 100; Adams v. Railway, 68 Texas, 265; Magee v. Chadoin, 30 Texas, 644; Doswell v. De la Lanza, 20 How., 33; Smith v. Boone, 84 Texas, 526;

White v. Martin, 66 Texas, 342; Cattle Co. v. Bacon, 79 Texas, 5; Horton v. Pace, 9 Texas, 84; Jenkins v. Chambers, 9 Texas, 231; Lake v. Wafer, 16 Texas, 570; Wyllie v. Wynne, 26 Texas, 43; Styles v. Gray, 10 Texas, 507; Stafford v. King, 30 Texas, 271; Frederick v. Hamilton, 38 Texas, 341; Jones v. Burgett, 46 Texas, 284; Moore v. Reiley, 68 Texas, 670; Lilly v. Blum, 70 Texas, 705; Beatty v. Masterson, 77 Texas, 168; Cassin v. O'Sullivan, 61 Texas, 595; Thomson v. Railway, 68 Texas, 397; Sanborn v. Gunter, 84 Texas, 284.

3. The question arises as to whether or not a legal survey can be made by adopting another survey. In the case of Horton v. Pace, 9 Texas, 84, the court say: "It was competent for the surveyor to adopt that survey for the plaintiff, and the case of Lynn v. Scott has been relied on as authority. We do not question the surveyor's right to adopt a previous survey that he thinks correct, as was done in that case." The right to adopt field notes depended only upon the surveyor's belief in the correctness of the field notes which he adopted. The case of Jenkins v. Chambers, 9 Texas, 231, is to the same effect; as also those of Lake v. Wafer, 16 Texas, 570; Styles v. Gray, 10 Texas, 506; and Thomson v. Railway, 68 Texas, 392.

4. This brings us to the question as to whether or not the surveyors could lawfully write field notes from the data they had in their possession, obtained from actual knowledge of the surveys, which they had run and knew to be correct. All of the decisions hold that such could be done. This rule was expressly recognized in Jones v. Burgett, 46 Texas, 292, and Doswell v. De la Lanza, 20 Howard, 33, as well as in many other cases.

5. Section 7 of the Act of July 14, 1879, under which these lands were purchased, provides: "It shall be the duty of the Commissioner of the General Land Office to give such general and specific instructions to surveyors, in relation to the surveying of the public lands, under the provisions of this act, as may best subserve the interests of the State, and carry into force and effect the intent and purpose of this act." It will be observed, that under the provisions of the very act which offered these lands for sale, it was the duty of the Commissioner of the General Land Office to formulate rules and give instructions to surveyors. It is to be presumed, that the Commissioner, in obedience to the law, gave such general and specific instructions as were deemed by him necessary, and that the surveyors followed the instructions given, and that these surveys have been made in accordance therewith.

6. Contractor Thomson surveyed 1,000,000 acres for the University. Land Commissioner Walsh deemed it of no importance whether the corners to each 640 acres survey were established before or after the contractor obligated himself to establish them. Contractor Thomson had done a great deal of this work before he took the contract, and it was

distinctly understood between him and the Commissioner that he should adopt the work already done by him in returning field notes for the University under his contract. Land Commissioner Hall, under the Act of 1887, very wisely instructed State Surveyor Strong to adopt the work of the United States Government in Greer County for the State, in so far as it could be done under that provision of our law that requires surveys on navigable streams to front thereon only the half of the square thereof. The instructions were to practically adopt the whole of the United States survey of Greer County.

7. The law adopted by the Revised Statutes is not more exacting than the old law.

8. Article 3908, Revised Statutes, was a continuation of the law then in force with reference to making actual surveys on the ground; and was not a re-enactment of the law then in force, nor the enactment of a new law in reference thereto. It is substantially and in fact the same as the statute and the common law in force prior to the adoption of the Revised Statutes. Report of Commission of Codifiers, 2 Sayles' Civ. Stats., pp. 732, 733, 739–741; Stafford v. King, 30 Texas, 271; Sanborn v. Gunter, 84 Texas, 284; 1 Sayles' Early Laws, 100, secs. 19, 20, 21; Rev. Stats., Final Title, secs. 19, 23.

9. An actual survey has been required by all our laws providing for the disposition of the public domain; but while this is true, still the Supreme Court of the Republic and State, by one continuous line of decisions, has established a rule, that the field notes of a survey made by one surveyor may be adopted by another. Upon this rule of property the rights of appellants in this case depend, and under it the officers of the State acted in making appellants' surveys. Jones v. Menard, 1 Texas, 789; Howard v. Perry, 7 Texas, 259; Horton v. Pace, 9 Texas, 81; Jenkins v. Chambers, 9 Texas, 167; Doswell v. De la Lanza, 20 How., 29; Spencer v. Lapsley, 20 How., 264; Magee v. Chadoin, 30 Texas, 644.

10. The rule of property in this cause has all the force and effect of a statute, and is the law of the land.

*Certificate of the Land Commissioner.*— 1. The court erred in permitting the State to introduce in evidence the certificate of the Land Commissioner as the only evidence to show that surveys 26 to 32 of block M were never returned to the General Land Office, and in finding thereon that the field notes of such surveys were not so returned. The only statement to the contrary was the certificate of W. L. McGaughey, Land Commissioner of the State. He certifies, " That the field notes of 26 to 32, block M, both inclusive, of the alleged Bacon and Graves survey, in Scurry, Borden, and adjoining counties, were never filed in the Land Office at Austin, and are not now on file in said office, as appears from an examination of the files and other papers connected with said surveys."

2. This officer states in his deposition, " that he has resided at Austin

since the 20th day of January, 1891; holds the office of Commissioner of the General Land Office; has had very little experience in Texas; * * * experience in the General Land Office dates from January 20, 1891; * * * had very little experience in said office prior to that date." How is it possible then for him to know that they had never been filed in the Land Office? What record and file in his office will show that they were never filed there? He could not speak of his own knowledge, because it was limited, as he himself stated. Buford v. Bostick, 58 Texas, 67; Rev. Stats., arts. 3805, 3910.

*Responsibility of Purchaser.*—The court erred in holding that Bacon and Graves were not responsible parties at the time they applied to purchase the land, because that issue had been settled by the surveyor who surveyed the lands, and could not again be raised on this trial between the parties at interest. If the law intended the purchaser should be responsible, meaning thereby financially able individually to pay the money at the time the application was made, it was folly to give the purchaser seven months, as the law did, from the date of his application to the day on which he was required to pay the money. This point is settled by the case of White v. Martin, 66 Texas, 342.

*Tender of Purchase Money.*—The court erred in holding that Bacon and Graves never paid or offered to pay for said land until long after the expiration of the time allowed and required by law; for that defendants acquired a vested right by the survey of the lands made prior to the repeal of the law, and their right to the land could not be impaired by the law being repealed, nor by any adverse legislation in respect thereto. The tender of the money was in all respects a lawful and legal tender, as required by law for the purchase of lands, and was in all respects sufficient to pay for those surveyed both prior and subsequent to the repeal of the law. White v. Martin, 66 Texas, 342; Cattle Co. v. Bacon, 79 Texas, 5; Odom v. Carter, 36 Texas, 282.

*Return of Purchase Money.*—The court erred in holding that the State is not bound to return the money paid in January, 1891, to entitle it to a judgment for the land. Gen. Laws 18th Leg., 113, 114; The State v. Snyder, 66 Texas, 700.

2. The State, by putting the lands on the market for sale and accepting the purchase money, is estopped from denying defendants' right to the land without returning or offering to return the money it has received for the land, as the State can not in good conscience and equity hold the money and the land too. United States v. Beebee, 127 U. S., 344; Pennoyer v. McCannaughy, 140 U. S., 19, 20; Haus v. Louisiana, 134 U. S., 20; United States v. San Jacinto, 125 U. S., 300; United States v. Budd, 43 Fed. Rep., 630; The State v. Morgan, 12 S. W. Rep., 244; United States v. McDaniel, 7 Pet., 1; Brent v. Bank, 10 Pet., 615; United States v. Baker, 12 Wheat., 559; The Siren, 7 Wall., 559; Donaldson v.

Dodd, 12 Texas, 381; Parker v. Bains, 59 Texas, 17; Cool. on Con. Lim., 187–191; Louisville v. Savings Bank, 104 U. S., 474; Arnold v. United States, 9 Cranch, 104, 120; Lester v. Garland, 15 Vesey, 248.

*Form of the State's Action.*—1. The court erred in overruling defendants' general and special exceptions as contained in defendants' first amended original answer, for the following reasons: First. Because the petition does not give any proper description of the land or state a proper cause of action. Second. Because the same is purely an action in trespass to try title to lands and for rents, and is such an action as is unknown, except by statute; is not afforded to and can not be maintained by the State against a citizen, for the State can neither be ejected nor disseized of her land or her public domain. Third. The petition contained no allegation of fraud or any specific wrongful acts, such as would warrant an action for the recovery strictly of the land in the simple statutory form of action provided by statutory law for one citizen to sue another. Fourth. Because the petition should have been in the nature of a bill in equity, showing the nature and character of plaintiff's claim and defendants' wrongful acts, etc., so that defendants could know and would be put upon notice of what charges they were expected to meet, and not be in total ignorance of the claims which the State, in her sovereign capacity, through her Attorney-General, might be permitted to raise on the trial of said cause, thus placing the citizen at a great disadvantage in a contest with the State.

2. There is no power or authority in the State, through her Attorney-General, to institute an action purely of trespass to try title to lands and for rents under our law; for the State, in legal contemplation, could not be ousted of its possession by a citizen; and in such an action, if permitted to bring an action purely of trespass to try title, no issue is admissible except one purely of title. Sedg. on Trial of Title, sec. 192; 3 Washb. on Real Prop., 173; Jackson v. Winslow, 3 Johns., 80.

*C. A. Culberson*, Attorney-General, and *R. L. Henry*, Assistant Attorney-General, for appellee.

*Validity of the Surveys.*—1. The important question is, whether, under the peculiar facts of this case, applicants may lawfully purchase public lands under the Act of July 14, 1879, as amended March 11, 1881, without having the lands surveyed for them in the field. It is admitted here that there was no actual survey for Bacon and Graves. The field notes were copied literally by the deputy surveyor Berry from the Elgin survey (which we will show was illegal and void), and were, with only a few exceptions, also literally copied therefrom by the deputy surveyor Williams. Each of these deputies testified that he had done surveying on block 97, of which this land was only a part, but neither could say whether he ever tested the accuracy of the Elgin survey of this particular

land.   In other words, their theory is, that having tested some of Elgin's work and found it substantially correct, they concluded that all of it was, and consequently adopted it.

2.   It is submitted that the second conclusion of law found by the trial court is correct.   In order to give them a right to purchase, the statute requires that persons desiring to do so shall cause the land "to be surveyed by the authorized public surveyor of the county or district in which said land is situated."   It is only when the applicant has caused a survey of the land to be made for him that the proposition of the State is accepted, and contractual relations are formed.   The State's requirements must be strictly complied with before any rights attach.   It has demanded a survey for the particular purchaser, and it has the right to insist that the demand shall be strictly met.   That a survey of the land has been previously made is of no consequence.   In view of the many and gross inaccuracies in surveys throughout the State, known to the Legislature and this court, it was but a measure of caution and protection against land spoliation that a survey for the person desiring to purchase should in all cases be made.   The law having made it a prerequisite that the person desiring to purchase "may do so by causing the tract or tracts which such person desires to purchase to be surveyed," it is not competent for any executive officer or the courts to dispense with the requirement and substitute for it a survey made many years before for another person or corporation.   Act of July 14, 1879, sec. 2; White v. Martin, 66 Texas, 340; Cattle Co. v. Bacon, 79 Texas, 5.

3.   The State has the right to insist that its proposition, that the proposed purchaser shall himself cause the land to be actually surveyed in the field, shall be strictly met.   Without it there is no contract.   State v. Work, 63 Texas, 148; White v. Martin, 66 Texas, 340; Cattle Co. v. Bacon, 79 Texas, 5; Yosemite Valley Cases, 15 Wall., 77; Frisbie v. Whitney, 9 Wall., 187; Pennoyer v. McConnaughy, 140 U. S., 24; Anson on Con., 15; Bish. on Con. (old ed.), sec. 698; Bish. on Con. (enlarged ed.), secs. 323, 330, 334, 1420.

4.   The proposition of the State, that if they would cause the land to be surveyed they might purchase it, was accepted by Bacon and Graves by filing their application, but was not performed.   They say, in effect, we will not cause the land to be surveyed, but will cause the surveyors to adopt and certify to a previous survey which they believe is correct. This is not sufficient, and is not a performance of the contract between the parties.   "If one of two parties is to do a thing, whereupon the other is to do something else, the former can not sue the latter for nonperformance until he has himself performed.   Nor will it suffice that the thing which the plaintiff has done is as good as what he agreed; it must be the particular thing."   Bish. on Con. (enlarged ed.), sec. 1420, and authorities above cited.

5. To require the purchaser to cause a survey to be made, means a survey on the ground. The law requires this; and these deputies falsely certified that the "survey was actually made in the field." Rev. Stats., art. 4025. Nor can any other construction be placed upon the language of this court in the "agreed" Jumbo Cattle Company case, 79 Texas, 11, where it would not permit so grave a matter to pass unnoticed. Rev. Stats., art. 3908, par. 8; Sanborn v. Gunter, 84 Texas, 284; Baxter v. Traver, 130 U. S., 236.

6. It is, however, argued by appellants, that because Commissioners Walsh and Hall, in one instance each, permitted the adoption of surveys, it should be done here. Walsh acted under the only statute which expressly authorizes the adoption of surveys, as we have shown (2 Sayles' Civil Statutes, articles 4025, 4026, 4037a); and Hall acted under a statute which clothed him with discretion as to the character of the surveys to be made. 2 Sayles' Civ. Stats., arts. 4038, et seq. Both Walsh and Hall testify that they never authorized the adoption of surveys under the fifty-cent act. Though the surveyors were officers of the State, it was incumbent upon Bacon and Graves to see that their acts were in accordance with law. Land Co. v. Thomson, 83 Texas, 169.

7. Bacon and Graves never surveyed, actually or otherwise, the land according to the acts of 1879 and 1881 offering the land for sale, but simply had the surveyors copy field notes and pretend to adopt them; and therefore they never complied with the State's offer, and are not entitled to the land.

8. The custom of running outside and base lines and doing the other work in the office can not supersede the statutes and decisions. Laws. on Usages and Customs, 455, sec. 218; Bish. on Con. (enlarged ed.), secs. 453, 454, 460. What work was done by Elgin was absolutely void, for he was surveying out of his district. Cox v. Railway, 68 Texas, 226. The land was also in the Texas & Pacific reservation in July, 1873. Cattle Co. v. Bacon, 79 Texas, 5.

9. If the court should hold that Elgin made a survey of the land in 1873, then it is submitted that the survey, as purported to have been made by him, was grossly inaccurate and incorrect, and for this reason could not be adopted. Neither the State nor other party can be forced to accept the adoption of these surveys. Thomson v. Railway, 68 Texas, 396.

10. The cases cited by appellants in their contention for the adoption of the field notes are based upon surveys prior to the adoption of the Revised Statutes, when the requirements for surveys were not so strict as now, as said by Mr. Justice Stayton in Thomson v. Railway, 68 Texas, 397. Compare 1 Pasch. Dig., arts 4522, 4523, 4528; Rev. Stats., art. 3908; Thomson v. Railway, 68 Texas, 397; Sanborn v. Gunter, 84 Texas, 284; Cattle Co. v. Bacon, 79 Texas, 11. The manner of making surveys was not so specific as now. Since then the Revised Statutes have

been adopted, and an actual field survey is required by article 3908, sub-division 8; permanent monuments and objects must be put up, and chain carriers must be sworn. Under these mandatory statutes a surveyor may not throw away his chain and compass and make surveys with an adjust-able belief.

*Certificate of the Land Commissioner.*—The court properly admitted in evidence the certificate of the Land Commissioner, who gave not his own knowledge of the transaction, but the result of an investigation of " the files and other papers connected with said survey." Rev. Stats., art. 2253. But if it shall be thought that the court erred in admitting the certificate, the error did not injuriously affect appellants, because the court having correctly held, upon several fundamental grounds, that ap-pellants never lawfully purchased the land, this question is immaterial. Tripis v. Weslow, 18 S. W. Rep., 684. Again, there being sufficient evidence to support the finding that these field notes were not returned, without considering the certificate, it will be presumed that it was disre-garded by the court in rendering judgment. Lindsay v. Jaffray, 55 Texas, 639.

*Graves an Employe of the Land Office.*—1. The court correctly found, that at the time Graves entered into the agreement with Bacon to pur-chase these lands, he was an employe of the General Land Office, and his action was against the civil and criminal laws of the State.

2. It is expressly agreed, that " Graves was employed in the General Land Office at Austin as draughtsman for the entire year 1882, except for the month of December, and that he drew his salary for the entire month of November, 1882, as well as the preceding ten months," which neces-sarily includes the 29th and 30th days of November, 1882.

3. The resignation of Graves was presented and its receipt acknowl-edged November 29, but neither the one nor the other states when it was to become effective. The agreement above quoted is an explicit inter-pretation by the appellants that he continued in the service of the State during the entire month of November. Without this interpretation, the result would be the same; for by continuing to draw the salary. Graves is estopped to deny employment. To be complete a resignation must in-tend and must in fact give up the office. He must let go the salary as well as the authority of the office. Mech. on Pub. Off., secs. 394, 411.

4. The court also correctly found, that Graves entered into an agree-ment with Bacon to purchase the land while the former was employed in the Land Office. Bacon testified, that " I had talked the matter over with Graves frequently prior to the 30th day of November, 1882. Mr. Graves and myself left Austin on the 29th or 30th of November for Palo Pinto, for the purpose of entering into the business of purchasing the land in controversy." Rev. Stats., art. 3982; Act of July 14, 1879, sec. 3; Penal

Code, arts. 118, 119; The State v. Work, 63 Texas, 148; The State v. Thompson, 64 Texas, 690; Bish. on Con. (enlarged ed.), secs. 471, 476.

*Tender and Payment of Purchase Money.*—1. The payment of the money to the Treasurer in January, 1891, was long after the time in which it was required to be paid, and after the repeal of the law, and the Treasurer was not authorized to accept it or bind the State. His action was a nullity. Act 1879, sec. 5; Laws 1883, p. 2; Cattle Co. v. Bacon, 79 Texas, 12; Bish. on Con. (enlarged ed.), sec. 993.

2. There was no legal tender in 1883. It will be observed by the court, that on December 1, 1882, Bacon and Graves applied to purchase "about 550 sections" of land in one solid body. This land purports to have been surveyed into four blocks between January 17 and 24, 1883, by only two deputy surveyors, and aggregates about 375,040 acres. This transaction, if good for any purpose as a contract, was intended as an entirety and should stand and fall as such. The law authorizing the sale was repealed at 1:30 p. m., January 22, 1883, and took effect from its passage. As a matter of law, therefore, all surveys made on January 22, 1883, and those made after that day, are illegal and void. That is to say, the act having taken effect from its passage, included the day of its passage in its operation. O'Connor v. Towns, 1 Texas, 114; Arnold v. United States, 9 Cranch, 104; Tomlinson v. Bullock, L. R. 4 Q. B. Div., 230; Matter of Howes, 21 Vt., 619; Matter of Welman, 20 Vt., 653.

3. There are 52 sections in block N. A tender in bulk was made on all of them. Sections 1 to 12 purport to have been surveyed January 23; as also some of the sections in other blocks. It was the duty of appellants, if in fact they had a contract with the State, to tender the precise amount due for the particular sections of land to which they were entitled, they being separable contracts and obligations. Act March 11, 1881, sec. 6; 2 Pars. on Con., 6 ed., *641.

4. If the rule be adopted, that the contract to purchase the solid body of land must stand in its entirety, then there was no legal tender. The land was described in the application by metes and bounds. It is claimed to have been afterward surveyed into four blocks of 586 surveys, or 375,040 acres. The tender was only for 370,560 acres, or a difference against the State of $2240 and 4480 acres. 2 Pars. on Con., 6 ed., *639, *640.

*Responsibitity of Purchaser.*—1. Bacon and Graves were not responsible parties at the time they applied to purchase the land. The surveyor, in the first instance, may pass upon the responsibility of applicants, but his action is not conclusive upon applicants or the State. The former, in a proper case, may compel him by mandamus to file the application and make the survey; and the State, whatever may be the limitations upon its rights, may at least repudiate his official acts when they are designedly

against its interests with the knowledge and sanction of the applicants. Laws 1879, p. 48, sec. 3; White v. Martin, 66 Texas, 342, 343; Railway v. Locke, 63 Texas, 623.

2. Section 3 of the Act of July 14, 1879, provided, that "it shall be the duty of the surveyor to whom application is made by responsible parties to survey the lands designated within three months from the date thereof." This means that the party must be able at the time of the application to pay for the surveying and filing of the field notes and to pay for the land. Bacon and Graves were not able.

*Return of Purchase Money by State.*—1. The court correctly held that the State is not bound to return the money paid to the Treasurer in 1891 before it can sue for and recover the land. The presumption that the State will do justice, and if the land is recovered the money will be repaid, can not be questioned in the courts. The State v. Thompson, 64 Texas, 690; The State v. Snyder, 66 Texas, 687; Borden v. Houston, 2 Texas, 611; Randolph v. The State, 73 Texas, 485; Bates v. The Republic, 2 Texas, 618; United States v. Coal Co., 137 U. S., 170.

2. The doctrine of estoppel invoked by appellants in this connection is inapplicable to the State. Bish. on Con. (enlarged ed.), sec. 993; Day Co. v. The State, 68 Texas, 541, 553; Cattle Co. v. Bacon, 79 Texas, 12; Sherman v. Buick, 93 U. S., 209; Moffatt v. United States, 112 U. S., 24.

3. The Act of April 14, 1883, is not applicable to this case. By the caption and preamble, it is shown to have reference only to special funds paid in error; but if deemed applicable, it is void. Const., art. 8, sec. 6; Treasurer v. Wygall, 46 Texas, 465; The State v. Snyder, 66 Texas, 700.

4. The payment of the money in January, 1891, was unauthorized. The receipt by the Treasurer can not bind the State, and his act was a nullity. The law, and not the act or advice of any officer, must govern. Laws 1879, sec. 5, p. 48; Laws 1883, p. 2; Cattle Co. v. Bacon, 79 Texas, 12; Bish. on Con. (enlarged ed.), sec. 993.

*Form of State's Action.*— 1. The objections to the form of the State's action in trespass to try title are not tenable. The petition was not excepted to because of the insufficient description of the land. Besides, the description of the land in the petition is a verbatim copy of that in the application to purchase.

2. The State may maintain an action of trespass to try title, and it is not necessary to allege the nature of its title or the grounds relied upon for recovery. Rev. Stats., arts. 4784, 4786; The State v. Delesdenier, 7 Texas, 96; Daingerfield v. Paschal, 20 Texas, 537; Day Co. v. The State, 68 Texas, 535.

3. Where no exception is made by law, the State must prosecute its suits for civil rights in the same way and under the same forms of remedy prescribed by the laws of the forum for individual suitors. The State v.

Kroner, 2 Texas, 492; The State v. Delesdenier, 7 Texas, 96; The State·
v. Snyder, 66 Texas, 695, 700.

4. It is not necessary for the State, or any plaintiff, in an action of
trespass to try title, to plead the evidence or elements of title relied on...
Hughes v. Lane, 6 Texas, 289; Day Co. v. The State, 68 Texas, 535;
Sedg. & Wait on Trial Title to Land., secs. 439–445.

HEAD, ASSOCIATE JUSTICE.—We adopt the findings of fact filed by
the court below, except from finding 20 strike out the words, " were not·
responsible parties," and add to finding 23 the following: " By the word
' protest,' as used in this finding, is meant that the Treasurer of the State·
had several times refused to accept this money, and at the time he re-–
ceived it in January, 1891, the parties paying fully understood that the·
State would contest their claim to this land, and the Treasurer did not·
receive the money as a legal payment therefor."

The subject matter of this controversy is 466 sections, or 298,240 acres·
of land, situated in Scurry, Borden, and adjoining counties.

In 1873 the Houston & Texas Central Railway Company, for the pur-
pose of locating its land certificates thereon, had a large amount of sur-
veying done in Scurry, Borden, Howard, Kent, and Fisher Counties.
This surveying was done by dividing large blocks of land into sections·
containing 640 acres each, as will be seen by reference to our conclusions
of fact, and was done upon the ground in such way as might be regarded
as work in the field.  The surveying so done by said railway company
embraced all of the land in controversy in this suit, but its right thereto·
failed by reason of the land at that time being within what is known as·
the Texas & Pacific Railway Reservation.

On December 1, 1882, E. M. Bacon and E. G. Graves made application·
to the proper surveyor to survey for them a large part of this Houston &
Texas Central Railway Company land, embracing that in controversy in:
this suit, which they desired to purchase under the Act of July 14, 1879,·
amended March 11, 1881, which was generally known as the fifty-cent act.

The surveyor, instead of doing this work upon the ground, simply
adopted the work which had previously been done by the railway com-
pany, and copied their field notes from the records in his office, and the
field notes so obtained were returned by Bacon and Graves, as to the
land in controversy, to the General Land Office within the time required
by the law above cited.  Bacon and Graves, at the time they returned
the field notes, knew how the surveyor had obtained them, and that none
of the work had been done in the field.  The deputies of the surveyor,
however, who appeared from the certificates to the field notes to have
done this work, had previously been upon the ground in making other

surveys, and had seen enough of the railway work to satisfy them of its correctness.

The act under which Bacon and Graves were attempting to acquire this land provides, that "Any person, firm, or corporation desiring to purchase any of the unappropriated lands herein set apart and reserved for sale, may do so by causing the tract or tracts which said person, firm, or corporation desire to purchase to be surveyed by the authorized public surveyor of the county or district in which said land is situated;" and the question as to whether or not the obtaining of the field notes in the manner above set forth should be considered as their having had the land *surveyed* within the meaning of this act, constitutes the most important question for our decision in this case.

Prior to the adoption of our Revised Statutes, in prescribing the manner in which surveys were to be made, our law provided, that "The courses of the lines shall be determined by the magnetic needle, and care shall be taken to determine its variation from the pole in the district where the surveys are made. The surveys shall be made with great caution, with metallic chains made for the purpose, and care shall be taken that the place of beginning the survey of each parcel of land be established with certainty, taking the bearings and distances of two permanent objects at least."

Under this law, at an early day, the practice became so common among surveyors to disregard its provisions, by making out field notes in their offices from data obtained otherwise than by work done upon the ground, that the courts in a great number of cases have felt constrained to hold that where the question was raised by subsequent locators, or third parties adversely interested, such acts on the part of the surveyor would constitute a valid appropriation of the land as against such claims. Horton v. Pace, 9 Texas, 84; Jenkins v. Chambers, 9 Texas, 231; Jones v. Burgett, 46 Texas, 293; Styles v. Gray, 10 Texas, 506; and in Thomson v. Railway, 68 Texas, 392, strong language is used recognizing the adoption of field notes previously surveyed as being a legal survey within the spirit of our law as it stood previous to the adoption of our Revised Statutes. At the same time, it is not to be denied that to constitute a survey *strictly* within the terms of our law as it has always been, it would be necessary for the work to be done upon the ground in the manner prescribed by the statute.

In Stafford v. King, 30 Texas, 269, it is said: "It is the duty of the surveyor to run round the land located and intended to be embraced by the survey and patent, to see that such objects are designated on it as will clearly point out and identify the locality and boundaries of the tract, and to extend a correct description of these objects, natural and artificial, with courses and distances, into the field notes of the survey, in order that they may be inserted in the patent, which will afford the

owner, as well as other persons, the means of identifying the land that was in fact located and surveyed for the owner.'' In Sanborn v. Gunter, 84 Texas, 284, it is said: "Actual surveys by which lands granted by the State shall be specifically described and distinguished have always been contemplated and prescribed by our laws. It is true, that under the laws in force when the surveys in controversy were made for the railway company, it was not always regarded as indispensable, however desirable, that the lines of the survey should be actually run and measured on the ground.''

Recognizing the great inaccuracies that had frequently resulted from the practices of the different surveyors in attempting to make out field notes in their offices without surveying the land upon the ground, our Legislature, in adopting the Revised Statutes, inserted this provision, (article 3908): "The field notes of each survey shall state: (1) The county or district in which the land is situated. (2) The certificate or other authority under or by virtue of which it is made, giving a true description of same by numbers, date, when and where issued, name of original grantee, and quantity. (3) The land by proper field notes with the necessary calls and connections for identification (observing the Spanish measurement by varas). (4) A diagram of the survey. (5) The variation at which the running was made. (6) It shall show the names of the chain carriers. (7) It shall be dated and signed by the surveyor. (8) The correctness of the survey, and that it was made according to law, shall be certified to officially by the survey or whomade the same; and also, that such survey was actually made in the field, and that the field notes have been duly recorded, giving book and page. (9) When the survey has been made by a deputy, the county or district surveyor shall certify officially that he has examined the field notes, has found them correct, and that they are duly recorded, giving book and page of record.''

We think the principal object of the Legislature in requiring such strictness in the certificate to be made by the surveyor was to correct the abuse to which the previous law had been subjected as above indicated; and we think it must be conceded, that if the Legislature has the power to condemn what is commonly known as an office survey or office work, and to require its officers, before parting with the public land of the State, to have the surveying actually done in the field, it has done so by the passage of this statute. We know of no case in which the question has been raised as to the validity of an office survey, or the adoption of previous field notes for a survey which should have been made in the field, since the adoption of our Revised Statutes: but our Supreme Court, in several cases, has given strong intimations that its rulings under previous laws would not apply to such surveys.

In Thomson v. Railway, 68 Texas, cited above, in which the very strongest language is used in upholding such surveys under previous

laws, it is said: "The manner of making surveys was not so specifically prescribed, nor the requirements so exacting, in the year 1874 as are they by the law now in force," etc. Also, Chief Justice Stayton, in a dissenting opinion delivered by him in Sanborn v. Gunter, 84 Texas, 290, uses this language: "I do not understand the holding to be that the field notes returned into the General Land Office were void because not based on the actual survey of each of the four lines of every section embraced in the block. If such were the holding, it would be useless to refer to decisions made under the laws in force prior to the adoption of the Revised Statutes for the purpose of showing that the rulings of this court have in all preceding cases been to the contrary." Also, see the opinion of the majority of the court in Sanborn v. Gunter, 84 Texas, 284, quoted above.

In Jumbo Cattle Company v. Bacon and Graves, 79 Texas, 12, in speaking of what would constitute a survey of this land under the Acts of 1879 and 1881, it is said: "We think, too, that the agreed statement shows that they have taken all the steps required of them to perfect their right to the land had these acts remained in force. However improbable it may be that this vast quantity of land could have been surveyed into sections of 640 acres each within two days, we feel bound to follow the explicit agreement, that on January 19 and 20, 1883, the said surveyor of Palo Pinto Land District surveyed the lands in controversy into tracts of 640 acres each."

It will be borne in mind that the question presented for decision in this case is not whether the field notes, made out as indicated in the first part of this opinion, constitute such a survey as the officers of the State could adopt, should they see proper to do so, nor whether it is such an absolute nullity as could be taken advantage by a third party; but the question is, does it constitute such a survey within the meaning of the law as the State can be compelled to accept in opposition to its wishes? The appellants are seeking to enforce against the State an executory contract, and base their right to do this upon the ground that they have complied with their part of such contract. In such case, we think they should show that they have obtained the field notes in the manner the State said they should be obtained in its proposition, and not that they have got as good field notes in some other way as would have been obtained had they complied with the State's offer. Had an individual owned this large body of land, and had published and offered to sell to any person 640 acres, who would have it surveyed by the authorized public surveyor of the county in which the land was situated, and that such surveyor must certify that the work was actually done in the field, we think it would hardly be contended that the proposed purchaser could file his petition against the owner, setting up that the surveyor had copied some field notes for him from the work which had been done by some other

surveyor years before, and that by reason of the field notes thus obtained he had a right to compel the owner to accept such field notes as a compliance with his offer, and to execute a deed for the land embraced therein; and we see no reason why a different rule should be applied to the State than that applied to an individual under similar circumstances. We know of no case in which the State, as a compliance with an executory contract, was held bound against its wish to accept one of these office surveys, even under the old law; and still less do we believe that it could be compelled to accept such field notes under the law as it was at the time these surveys purport to have been made.

We think the court did not err in overruling appellants' special exceptions to the petition of the State. Appellants had filed an application to purchase land under the Act of 1879, giving the description of their desired purchase substantially as set forth in the petition in this case, thereby showing that they assert claim to that part of the State's land, and we think they can not be heard to say that such description was not sufficient in a petition brought to cancel their claim; besides, the answer filed by appellants contained a sufficient description of that part of the land embraced in the State's petition which they claimed, and we see no reason why such description would not serve as a basis for the judgment rendered.

We also see no objection to the form of the State's petition. State v. Delesdenier, 7 Texas, 76; The State v. Kroner, 2 Texas, 492; Day Land and Cattle Co. v. The State, 68 Texas, 535.

We do not now consider it an open question in this State, that the State, in a suit of this kind, is not required to make a tender of the money received by it. The State v. Snyder, 66 Texas, 687; The State v. Thompson, 64 Texas, 690; The State v. Rhomberg, 69 Texas, 220; Randolph v. The State, 73 Texas, 485.

It will be seen from the conclusions of fact adopted by us, that we are of opinion that the finding of the court below, that Graves was an employe in the Land Office at the time he entered into the contract with Bacon to acquire this land, is supported by the evidence. We think the circumstances disclosed by the record lead to this conclusion, and would have justified a finding that, before he tendered his resignation, Graves and Bacon had come to an understanding as to the terms of their contract, and that Graves' resignation was tendered in pursuance of this understanding, to enable him successfully to carry out the arrangement that had previously been understood would be made when it might be legally done; but as what we have said disposes of all the land in controversy, and as we have not fully decided as to the effect the agreement above indicated would have in a case where all steps prescribed by the law in the acquisition of the land from the State were taken, after the resignation

had become complete, we have thought it best to express no opinion thereon.

We are of opinion that the first conclusion of law by the court below, that Bacon and Graves were not responsible parties at the time they applied to purchase this land, and could not purchase under the law, can not be sustained. We incline to the opinion that the question of responsibility, within the meaning of the Act of 1879, was for the surveyor to decide; and if he held them responsible parties and made the survey, this would be sufficient to hold the land until the expiration of the time allowed the purchaser in which to make payment. We do not believe it was the policy of the law to restrict such sales to persons who, upon investigation of their financial condition, would be found able to pay for the land proposed to be purchased out of their own means, and thereby preclude those equally worthy, who, while not actually owning sufficient property of their own to make the payment, might yet be able, in the time allowed, to make the necessary financial arrangements. White v. Martin, 66 Texas, 340.

If the court, in its third conclusion of law, intended to hold that because some of the surveys had a greater frontage of permanent water than is permitted under law, this would invalidate all of the surveys, we do not think the conclusion correct. It will be noted, that under this law the land was only to be sold in tracts of 640 acres, and we think that under these provisions each tract must be treated as a separate purchase; and while the sections having such excessive water frontage might be held invalid, in so far as it would enable the proposed purchaser to demand title from the State as to them, yet these invalid sections could still be used as a basis to locate and identify the other surveys in the block.

We are also of the opinion, that the fourth conclusion of law by the court below, to the effect that Bacon and Graves did not make a sufficient tender, can not be sustained as to all of the land. As stated above, we think each section must be taken as a separate purchase, and the tender made by them sufficiently identified all sections upon which they proposed to pay; and the fact that they did not make tender upon all of the sections embraced in the field notes returned by them would only have the effect to invalidate such part of the proposed purchase as was not designated in their offer to pay.

By the decision in Jumbo Cattle Company v. Bacon and Graves, 79 Texas, we understand it to be settled that the tender was in time, and that the Treasurer could not defeat their right to purchase by refusing to receive the money.

We are of opinion, that the court below erred in admitting the certificate of the Commissioner of the General Land Office to prove that surveys 26, 27, 28, 29, 30, 31, and 32 of block M were never returned to the General Land Office (Buford v. Bostick, 58 Texas, 67); but we are not

prepared to say that the evidence outside of this certificate was not suffi-
cient to sustain the finding of the court below that these surveys were
never in fact so returned.   There was no objection to the certificate of
the Commissioner to prove that he had made search for the field notes of
these surveys, and had been unable to find them in the General Land
Office, and that they were not at the time of making said certificate in
their proper places; and we think it quite as probable that these field notes
had been lost or mislaid before they reached the Land Office as after, and
for this reason the judgment of the court below as to these surveys could
be sustained without reference to the objectionable part of this certificate;
but as the bill of exceptions shows that the court below must have con-
sidered this part of the certificate of the Commissioner as important evi-
dence to sustain its finding upon this point, we are of opinion, that were,
it material in the disposition of the case, it would necessitate a reversal
as to these surveys.

We think what we have said sufficiently disposes of the other assign-
ments of error made by appellants; and as we find no error in the judg-
ment rendered by the court below, we are of opinion that it should in all
things be affirmed.

*Affirmed.*

* Delivered December 6, 1892.

A motion for rehearing was refused.

---

* Not received by Reporter with records of December.